IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 17-cv-1260-RBJ-GPG

THE HIGH LONESOME RANCH, LLC,

      Plaintiff,

v.

THE BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF GARFIELD,
THE UNITED STATES OF AMERICA, through its agency, the Bureau of Land Management, a
division of the United States Department of Interior,

      Defendants.

---

THE BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF GARFIELD,

      Counterclaim Plaintiff,

v.

THE HIGH LONESOME RANCH, LLC,
THE UNITED STATES OF AMERICA, through its agency, the Bureau of Land Management, a
division of the United States Department of Interior,

      Counterclaim Defendants.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER OF JUDGMENT**

---

This case was tried to the Court from October 19 to October 23, 2020.  ECF Nos. 137–

141.  For the reasons set forth in this order, the Court enters judgment in favor of defendant and

counterclaim plaintiff the Board of County Commissions of Garfield County.

**I. BACKGROUND**

1

This case follows two roads that have traversed nearly 150 years to come before this Court. Today the roads run through a privately-owned ranch in Garfield County, Colorado. The dispute is whether these roads are public or private. Plaintiff and counterclaim defendant The High Lonesome Ranch, LLC ("the Ranch") contends that the roads are private. Defendant and counterclaim plaintiff the Board of County Commissioners of Garfield County ("the county") asserts that the roads are public.

The Ranch originally filed this case in state court in April 2016 asking the court to declare that the roads are private. ECF No. 4. The county filed a motion to dismiss, asserting that the Ranch failed to name the United States Bureau of Land Management ("the BLM") as an indispensable party. The state court denied the motion to dismiss and ordered the Ranch to join the BLM as a party because the roads provide access to BLM-managed land, and the BLM would be impacted by a declaration of the roads' private or public nature. ECF No. 6. The Ranch filed an amended complaint that named the BLM as a defendant. ECF No. 7. The county then asserted counterclaims against the Ranch and the BLM asking the court to declare that the roads are public. ECF No. 8. In May 2017 the BLM removed the case to federal court. ECF No. 1.

In August 2018 the Ranch and the county filed cross motions for summary judgment. ECF Nos. 66, 67. The court denied the cross motions in January 2019 following a motions hearing. ECF No. 86. After extensive litigation and multiple trial continuances, the parties proceeded to a five-day bench trial. ECF Nos. 137–141. Though the BLM was represented at trial it did not present a case or formally take a position on the status of the road. Transcript ("Tr.") 1029:25–1030:1, 1056:6. The Court has considered the testimony and evidence admitted

2

at trial.  The Court has also considered the post-trial briefings submitted by the Ranch and the county.  ECF Nos. 142, 143, 145, 146.

The public or private nature of the roads depends on whether the county has carried its burden of proof on any of its public road theories: (A) public right-of-way under R.S. 2477 and/or C.R.S. § 43-2-201(e); (B) public prescriptive use under C.R.S. § 43-2-201(1)(c); (C) common law dedication, or (D) roads open for public travel under C.R.S. § 43-1-202.  If the county carries its burden, the Court may still deem the roads private if the Ranch proves that the county has abandoned them.  For the reasons set forth below, the Court holds that the roads are public, and that the county has not abandoned them.  The Court therefore enters judgment in favor of the Board of County Commissioners of Garfield County.

## II. FINDINGS OF FACT

### A.  __The roads, the Dry Fork valleys, and the Ranch__

There are two connected roads at issue in this case.  The first is called "North Dry Fork Road" which runs east to west from DeBeque, Colorado to the top of a ridgeline looking out across North Dry Fork valley.  Exhibit ("Ex.") 128 at 3.[1]  Only part of North Dry Fork Road is disputed.  The disputed portion starts at a locked gate on the Ranch's property in Section 27, Township 7 South, Range 99 West of the 6th Principal Meridian.[2]  Ex. 128 at 3; Tr. 892:22–25.  It runs west from the gate through Secs. 27–30 TS 7S-R99W and Secs. 25–26, 20–23, and 29–31 TS 7S-R100W.  Ex. 128 at 3.  The second road is called "Middle Dry Fork Road."  It starts by

---

[1] The map in Trial Exhibit 128 was created by BLM and published in 1995.  Ex. 128 at 1.  Although this map is twenty-five years old, the Court refers to it throughout this order because the parties used this map at trial and in their proposed findings and conclusions to point to the locked gate, the road, and the Ranch's property.

[2] All of the land at issue in this case is west of the 6th Principal Meridian.  Therefore, the Court intentionally omits any subsequent reference to the 6th Principal Meridian.

forking off from North Dry Fork Road in Sec. 25 TS 7S-R100W at an intersection often referred to as "the Y." Ex. 128 at 3; Tr. 141:16–19. Middle Dry Fork Road then runs southwest through Secs. 25–26 and 33–35 TS 7S-R100W and Secs. 4–5 TS 8S-R100W. Ex. 128 at 3. In this order I often refer to North and Middle Dry Fork Roads collectively as "the roads" for concision.

North Dry Fork Road also runs east from the locked gate through Secs. 26, 25–26 TS 7S-R99W, Sec. 31 TS 7S-R98W, and Sec. 6 TS 8S-R98W. Ex 128 at 3. That part of North Dry Fork Road is also known as County Road 200. North Dry Fork Road splits again in Sec. 6 TS 8S-R98W. As it continues east towards DeBeque it is called Dry Fork Road, and as it veers southwest it is called South Dry Fork Road or County Road 222. Tr. 900:17–25. These parts of the roads east of the locked gate are not disputed. *Id.* at 150:11–153:14.

**Figure 1. Map of the Dry Fork area (Ex. 128 at 3)[3]**



---

[3] The Court has adapted this version of the 1995 BLM map to include legible section numbers, township and range labels, and red lines distinguishing townships. This image and the one below show only a portion of the full map.

**Figure 2. Map of North and Middle Dry Fork Roads (Ex. 128 at 3)**



North and Middle Dry Fork Roads are situated in the Dry Fork valleys in Garfield County, Colorado.  Tr. 65:16, 66:14–18.  The valleys are alternately called Dry Fork Canyon and Middle Dry Fork Canyon.  *Id.* at 71:8–25.  This general area is located about twenty miles northwest of DeBeque, Colorado.  Ex. 128 at 3.  North Dry Fork Road runs through a spot also known locally as Ditman Canyon.  Tr. 71:8–12.  North and Middle Dry Fork Roads run directly alongside a creek aptly called Dry Fork Creek.  The Y at which the two road portions split is also where the creek splits, and both portions follow the creek going west and southwest from the Y.  To the north of North Dry Fork Road and the creek is Cow Ridge, which runs east to west.  To the south of the road is another ridge called Horse Mountain.  Ex. 128 at 3.

North and Middle Dry Fork Roads have proceeded along virtually the same routes between the late 1800s and today.  The exact location of the roads has shifted somewhat over time, however.  Maps overlaying the location of the roads from official 1885 and 1925 surveys against more recent aerial images of the roads from 1962 and 2011 show a few differences, including improvements and straightening of the roads and changes in width.  Exs. 138A11, 138a14a.  The Ranch's expert, Mr. Robert Lee, testified that these maps show the 1925 survey put the Y (the fork of North and Middle Dry Fork Roads) about 0.65 miles east of the Y's

location in 2011. Tr. 1013:8-25. Comparison of the 1995 BLM map (the main point of reference for both parties) to a 2015 BLM map also shows both North and Middle Dry Fork Roads extending further southwest in 2015. Exs. 128 at 3; 167.

The Court credits Mr. Lee's testimony and these maps but still finds that the roads have been in substantially the same location for at least one hundred years. The Court does not find slight deviations in the roads' location or width to diminish the certainty or definiteness of its route. These roads run along a creek through valleys with steep ridge formations on either side and thus are intrinsically subject to some change based on the natural landscape. No evidence was presented suggesting anyone was ever confused about the name or course of the roads based on these slight changes. Nor has there ever been an alternate route along either North or Middle Dry Fork Roads. The section numbers through which the roads run have not changed, excepting minor extensions to the southwest which are the obvious result of creating connector routes between North and Middle Dry Fork Roads in the mid-twentieth century. Tr. 182:16-24. The Court thus concludes that these slight variations in the roads are not significant.

Mr. Paul R. Vahldiek, Jr. is an attorney from Houston. *Id.* at 64:2–15. He is the founder and sole proprietor of the High Lonesome Ranch, LLC and the chairman of its board of directors. Mr. Vahldiek owns sixty-three percent of a fifty percent interest in the Ranch. *Id.* at 63:2–64:1. The High Lonesome Ranch is a recreational operation that offers hunting (particularly big game hunting) fly-fishing, hiking, biking, and horseback riding. It offers luxury accommodation and meals prepared by internationally renowned chefs. A five-day, six-night big game hunting package costs around $10,000 per person, inclusive of meals, lodging, and other recreational activity. *Id.* at 72:17–73:21, 154:23–155:16. The Ranch also uses a three-pronged approach to

6

conservation and sustainability that involves a model energy product, improved grazing practices, regenerative agriculture, non-interference with wildlife corridors, and other efforts at positive land stewardship.  In addition, the Ranch runs the first applied science institute of the American West.  *Id.* at 72:17–74:9.

The Ranch property encompasses three main areas.  The eastern area is called the Broadhead property, and it is generally located along the valley floors from the headquarters west to the Y fork in Sec. 25 TS 7S-R100W.  *Id.* at 67:13–68:6.  The western area is known as the McKay Fork property and is generally located from the western end of North Dry Fork road, going south through Middle Dry Fork Road, and finally further south to the western end of South Dry Fork Road.  *Id.* at 68:15–19.  The high northwest area, also known as the High Ranch, is not at issue in this case.  *Id.* at 67:19–24.  The Ranch's headquarters are located at the intersection of North Dry Fork, Dry Fork, and South Dry Fork roads in Sec. 6, TS 8S-R98W.  This is also the site of the old Dry Fork Schoolhouse.  *Id.* at 66:14-18, 69:7-15.

Virtually all of the land situated directly on either side of the disputed parts of Middle and North Dry Fork Roads is owned by the Ranch.  Ex. 128 at 3.  However, there are between 50,000 and 90,000 acres of public land managed by the BLM beyond this private land.  *Id.*; 718:17-25; Ex. 160 at 2.  Those BLM lands are currently accessible to the public in two main ways.  The first is by parking east of the current locked gate and hiking up Cow Ridge, which takes between forty-five minutes and an hour and a half.  The second access point is near McKay Fork Ranch to the west via 16 Road that begins in Fruita, Colorado.  This location is reachable by a four-wheeler and a short hike from the roadway.  These points, however, are substantially less accessible than access via the roads would be.  Jim Giese, an experienced hunter who hunted in

the Dry Fork area for twenty years, testified that these access points were "substantially more difficult," and that even he found them difficult.  Tr. 858:14–859:10, 869:13–870:23, 888:1-13.

Public access to BLM lands in the Dry Fork area would increase substantially if the public could drive up Middle and North Dry Fork Roads past the locked gate.  *Id.* at 714:25–717:14. 718:17-25; Exs. 108 at 1; 160 at 2.  But this increased access would lead to more hunters in the area, which would disadvantage the current "dedicated" hunters who are willing to work to reach remote hunting areas.  Tr. 879:22–880:9, 882:24–883:10.  Mr. Vahldiek and the Ranch are also concerned about increased access leading to trespassers and potential liability for injuries to the public on the Ranch's property.  *Id.* at 76:16-19, 98:1-14.

### B.  Establishment of the roads and early settlement in the Dry Fork valleys

The Dry Fork area was previously part of the Ute Indian Reservation.  Ex. 502 at 2.  During that time the lands were not part of the public domain and were not open to settlement.  Tr. 364:2-8.  Between 1880 and 1882 members of the Ute bands were forced off of their land and marched out of the area.  *Id.* at 764:11-19.  On August 4, 1882 President Chester A. Arthur terminated the reservation, and the reservation lands were "returned to the public domain."  Ex. 502 at 3–4.  As a result the lands in the Dry Fork valleys and canyons became subject to both purchase and homestead entry.  Tr. 363:18-24.

In 1885 the United States General Land Office ("GLO"), which later became the BLM, surveyed the Dry Fork area.  In February 1885, Mr. Eli M. Ashley surveyed TS 7S-R100W.  Ex. 505.  That same month, Mr. Henry Simons surveyed TS 7S-R99W.  Ex. 504.  Jointly the surveys showed a land route situated adjacent to and north of Dry Fork Creek running west from Sec. 27 TS 7S-R99W to Sec. 25 TS 7S-R100W.  The land route then crossed Dry Fork Creek and

proceeded southwest through Secs. 25–27 and 33–34 TS 7S-R100W.  As depicted on the surveys, the route essentially follows the entire length of Middle Dry Fork Road at issue in this case within TS 7S-R100W.[4]  Ex. 505.  The surveys label the land route a "trail."  Exs. 504, 505.  The Ranch's expert Mr. Steven Schulte testified that he believed this trail was a Ute Indian trail.  Tr. 768:1-6.  The county's expert Mr. James Beckwith testified that he believed it was a pedestrian or equestrian trail made by humans, but he could not say whether it was an Indian trail or a "settler" trail.  *Id.* at 366:25–368:17.

While the surveys do show a trail following part of the same route as the current roads, they only depict the portion of North Dry Fork Road that runs to the intersection with Middle Dry Fork Road in Sec. 25 TS 7S-R100W.  The part of North Dry Fork Road today that runs west of that intersection is not shown on the surveys.  Exs. 504, 505.  The 1885 surveys depict the entire trail as being immediately adjacent to Dry Fork Creek on the north side, whereas an aerial map from 2011 shows portions of the roads slightly further north of the creek.  *Id.*; Ex. 123a14a.

Mr. Schulte testified that in the late 1880s a few ranchers began acquiring land about fifteen to twenty miles northwest of DeBeque, which would be in what is now known as the Dry Fork area.  Mr. Schulte did not identify any other commercial activity in the Dry Fork area between 1882 and 1890.  Tr. 772:8-14.

In 1891 the federal government began issuing patents in the Dry Fork valleys along the roads at issue.  The government continued issuing a variety of patents through the early 1900s, including cash entry patents and patents under the 1862 Homestead Act, the 1878 Timber and

---

[4] The parties did not present surveys from 1885 depicting TS 8S-R100W, so the Court cannot make any findings about the existence of a trail in 1885 corresponding to Middle Dry Fork Road in that area.

Stone Act, the 1877 Desert Land Act, and the 1872 Mining Act. *Id.* at 773:21–774:19.

Cash entry patents simply required the buyer to pay cash for the land in exchange for the patent. There was no requirement that the buyer do anything to the land, and the date of entry and date of patent issuance were the same. Homestead Entry patents required patentees to "prove up" over a five-year period, which encompassed living on the property, cultivating crops, and improving the land in other ways. For homestead patents, the government issued the patent at least five years after the patentee entered the land. *Id.* at 381:7–382:11, 400:15-19. Livestock patents did not require residence but did require improving the land's grazing capacity through irrigation or other cultivation methods. *Id.* at 404:18–405:3. Timber and Stone, Desert Land Act, and Mining patents all also had requirements that created a lag between the entry date and the patent issuance date, unlike cash entry patents.

A table summarizing each patentee's name, application and patent issuance dates, serial number, and patent type is below. Ex. 510. A map showing the location and entry date for each patent along North and Middle Dry Fork Roads is also included below. Ex. 515 at 23.

| Application Date | Patent Date | Patentee | Serial No. | Type of Patent |
|---|---|---|---|---|
| 2.9.1891 | 2.9.1981 | Price Loveless | Ute-207 | Cash Entry |
| 7.30.1891 | Unknown | Artie Loveless | Ute-313 | No Record |
| 7.30.1891 | 7.30.1891 | Nathan Caughman | Ute-302 | Cash Entry |
| 11.9.1891 | 11.9.1891 | James S. Armstrong | Ute-456 | Cash Entry |
| 11.20.1891 | 11.20.1891 | Nathaniel F. Davis | Ute-517 | Cash Entry |
| 12.26.1891 | 12.26.1891 | Ursius Fischer | Ute-894 | Cash Entry |
| 5.26.1892 | 5.26.1892 | Sarah L. Carlisle | Ute-931 | Cash Entry |
| 5.26.1892 | 5.26.1892 | Joseph D. Crandell | Ute-947 | Cash Entry |
| 9.8.1893 | 9.8.1893 | Charles J. Smith | Ute-1132 | Cash Entry |
| 8.8.1901 | 8.8.1901 | James Loveless | Ute-314 | Cash Entry |
| 9.27.1904 | 9.27.1904 | James S. Armstrong | Ute-1743 | Cash Entry |
| 12.30.1905 | 12.30.1905 | Sarah F. Armstrong | Ute-1894 | Cash Entry |
| 11.23.1908 | 2.17.1915 | William H. Johns | GS-01019 | Timber and Stone |
| 8.20.1915 | 3.25.1921 | Samuel K. Walker | GS-09689 | Homestead Entry |
| 11.23.1915 | 3.25.1921 | Samuel K. Walker | GS-010029 | Homestead Entry |
| 12.28.1916 | 1.6.1922 | Harriette J. Tobyne | GS-011674 | Desert Land Act |

| Application Date | Patent Date | Patentee | Serial No. | Type of Patent |
|---|---|---|---|---|
| 7.1.1920 | 7.8.1925 | Dorthula E. Smith | GS-019552 | Livestock Raising |
| 3.4.1919 | 3.20.1926 | Edgar P. Ditman | GS-016350 | Livestock Raising |
| 12.4.1918 | 3.20.1926 | Edgar P. Ditman | GS-08685 | Livestock Raising |
| 12.9.1915 | 6.29.1920 | Ashley M. Stoner | GS-08723 | Homestead Entry |
| 11.9.1917 | 6.29.1920 | Ashley M. Stoner | GS-014231 | Homestead Entry |
| 6.11.1919 | 6.29.1920 | Ashley M. Stoner | GS-016884 | Homestead Entry |
| 5.11.1915 | 3.23.1928 | Julia and William Ditman | GS-08664 | Homestead Entry |
| 4.6.1928 | 8.27.1930 | J.N. Gordon | DEN-040110 | Mining Patent |
| 4.6.1928 | 8.27.1930 | J.N. Gordon | DEN-040111 | Mining Patent |
| 3.15.1930 | 10.12.1936 | Ashley M. Stoner | DEN-042729 | Homestead Entry |
| 4.25.1929 | 8.2.1937 | Flora A. Walker | DEN-041658 | Homestead Entry |
| 6.2.1933 | 3.25.1940 | Peter Becker | DEN-045794 | Homestead Entry |
| 5.2.1934 | 4.26.1941 | Claud W. Davis | DEN-046558 | Livestock Raising |
| 8.10.1940 | 12.28.1942 | Theodore M. Walker | DEN-046195 | Livestock Raising |
| 6.17.1940 | 6.17.1940 | Clifford W. Young | DEN-045694 | Livestock Raising |

**Figure 3. Entry Chronology for patents in the Dry Fork Area, 1891 – 1940 (Ex. 515 at 23)**



A major question at trial was whether patentees occupied their land, and if so, when.  Mr.

Beckwith testified that it was reasonable to assume each patentee physically entered his or her

patented land, and in fact did so *prior* to the patent being issued.  Tr. 635:6–636:2, 652:6-12.  He

based his conclusion on the assumption that prudent would-be landowners would inspect the

land they planned to buy prior to purchase.  *Id.*  By contrast, Mr. Schulte testified that there was

no occupancy requirement for cash entry patents, and that they were generally subject to land

11

speculation.  He also testified that the GLO could not monitor all patents, suggesting that even patented parcels requiring occupancy might not always be occupied.  Tr. 774:1–777:9.

To rebut this suggestion the county pointed to tax assessor records from 1892 through the 1940s.  *Id.* at 541:21–563:7.  A tax assessor would physically inspect people's property and homes to record how much land they had, what type it was, what animals were on it, and what personal items (such as vehicles) they had on it.  *Id.*  The assessor records indicate that at least some patentees occupied their land after their patent entry date.  For example, in 1892 Sarah Carlisle grazed 300 heads of cattle on her land near the Y (intersection of North and Middle Dry Fork Roads).  *Id.* at 515:15–553:22.  In 1929 Ashley Stoner was assessed as having agricultural, grazing, and irrigation lands, horses and cattle, household property, one road vehicle, and farm equipment, all on North Dry Fork Road just west of the Y.  *Id.* at 560:8–561:16.

A particularly important patent for this case was that of Sarah Armstrong.  Sarah Armstrong owned two tracts of land—one at the far west end of North Dry Fork Road, and the other east of the Dry Fork schoolhouse.  *Id.* at 554:7–557:22.  She obtained a cash entry patent in 1905 for the parcel at the very western end of North Dry Fork Road.  Ex. 510 at 2.  Ms. Armstrong sold that property in 1915 to W. Ditman (it later became known as the Ditman property).  Ex. 312 at 13.  Mr. Beckwith testified that there would have been only two ways to access that land, and both involved going from the Y intersection of North and Middle Dry Fork Roads all the way west to the end of North Dry Fork Road.  Tr. 391:20–394:3.  Between 1907 and 1915 the tax assessor assessed Ms. Armstrong for coal and agricultural land, horses and cattle, household goods, and three road vehicles.  *Id.* at 554:7–557:22.

Mr. Lee testified that many taxpayers in the area had multiple properties, including in

locations east of the disputed roads, and thus the county assessor records could not be used as evidence of activity along the roads for those taxpayers. *Id.* at 1014:5–1015:2. Mr. Beckwith directly refuted this testimony. He explained that the tax assessor entries were associated with specific parcels of land, not just the landowner, and that the above-mentioned property was associated with Ms. Armstrong's tract at the west end of North Dry Fork Road. *Id.* at 554:7– 557:22. The Court's own review of the tax assessor records support Mr. Beckwith's conclusion. *E.g.* Ex. 518 at 9. The evidence shows that Ms. Carlisle and Mr. Stoner lived on their land, and Ms. Armstrong actively occupied her western property from at least 1907 and traveled all the way west along North Dry Fork road in order to do so. However, none of the evidence supports the conclusion that patentees went onto their land *prior* to the patents being issued. The patent records show that the date of application and date of patent issuance are the same for the first nine cash entry patents. Additionally, none of the tax assessor records show activity on parcels before the year they were patented, only the year of or after. Exs. 510; 518.

When discussing the use of these roads during the 1910s and 1920s, Mr. Beckwith stated that there was no evidence of a grocery or general merchandise store in this area, and that individuals would not have been completely self-sufficient on their land. Thus, they would have traveled along North and Middle Dry Fork roads going east to obtain supplies in DeBeque. Tr. 394:15-24. Other evidence of settlors using North Dry Fork Road included records about Ashley Stoner and his wife, who proved up their homestead patent. The homestead declaration submitted by Ashley Stoner's wife stated that they resided on their land for years prior to issuance of the patent—presumably using the Dry Fork Roads to do so. *Id.* at 419:15–420:21; Ex. 511 at 46. Since there was no rural postal route, residents living in Dry Fork also had to

drive the roads to DeBeque to access a post office.  Ex. 563 at 7.

Between 1925 and 1926 the GLO resurveyed the Dry Fork area (TS 7S-R99W, TS 7S-R100W) to correct errors in the 1884 and 1885 surveys.  Tr. 477:4–478:15, 974:22–973:13; Exs. 507, 508.  The resurvey of TS 7S-R99W shows a road labeled as "Road to DeBeque" which follows the same land route of North Dry Fork Road west to the Y and down Middle Dry Fork Road that was labeled as a "trail" in the corresponding 1885 survey.  Exs. 507, 504.  The resurveys also show North Dry Fork Road continuing west from Sec. 25 TS 7S-R100W to Sec. 29, TS 7S-R100W, almost the western end of its current location (in North Dry Fork or Ditman Canyon).  The 1925 surveys thus identify nearly the entire portions of North and Middle Dry Fork Roads at issue in this case, minus their very western terminuses.  *Id.*; 128 at 3.

The resurvey of Range 100 West shows an abandoned sawmill at the very western end of North Dry Fork road, three cabins along Middle Dry Fork Road, and various fences.  Ex. 508.  The resurvey of Range 99 West shows a house, fences, and a telephone line near or to the west of the location of the current locked gate.  Ex. 507.  Mr. Lee stated that the field notes for TS 7S-R100West noted just two inhabitants for the whole township.  Tr. 984:16-23; Ex. 132.  However, Mr. Lee also explained that the surveys were not a complete depiction of the area, because the surveyors predominantly mapped along the section lines such that interior data within section lines was not surveyed in as much detail.  Tr. 974:22–977:4.

At trial the Court heard about specific families living in the area using the roads in the 1920s onward.  Accounts of the Prather family provide ample evidence that the roads were used frequently during this period.  In 1925, the Prather family started renting the Goslin Ranch, which was owned by the Goslins from 1916 until 1927.  Ex. 511 at 4.  The Goslin ranch was

west of the current locked gate around Secs. 27 or 28 TS 7S-R99W.  Tr. 427:5-17; Exs. 511 at 4; 534; 564 at 3.  The Prathers had running water, suggesting that builders had hauled in and installed pipes.  Ex. 563 at 6; Tr. 428:3-10.  From 1926 the Prathers hosted workers, boarders, and visitors from out-of-town each year, including Sarah Prather's sister who visited on multiple occasions by car.  Exs. 564 at 4, 6; 563 at 7.  Together Ms. Prather and her sister would drive their children to DeBeque to get away from the ranch.  563 at 7.  The Goslin ranch had a telephone which would have required installation of a telephone line along the road.  *Id.* at 3.

One of the Prather children's daily trips to school provides further evidence the roads were in use.  Bob Prather entered the Dry Fork School in 1927.  Notably, the school had about twenty students around the time, including children of the Masters, Stoner, Rickstrew, Walker, and Armstrong families.  Exs. 565 at 3; 530 at 6–9.  In a memoir she later published, Bob's mother Sarah Prather wrote that her son rode a horse to school.  She noted that in fall of 1927 Bob's trips were complicated by the fact that there weren't "county roads" and that each rancher put a gate across the road.  As he rode Bob would have to get off his horse, open each gate, and get back on as he made his way to the schoolhouse.  *Id.*

Although the Prathers eventually moved to a different part of Garfield County, their family's connection to the roads did not end then.  According to Mr. Beckwith their son Bob returned to the Dry Fork area to work on various ranches, including one at the far western end of North Dry Fork Road owned by Lew Young.  Exs. 534; 564 at 6–7; Tr. 426:21–427:4.  Lew Young purchased the property in 1928 and lived on a ranch there with his wife Marie and their children.  Exs. 511 at 4; 562 at 3–4.  In the summer they would graze their cattle past the western ends of North, Middle, and South Dry Fork roads.  Ex. 562. at 6.

The Rickstrews, another family that lived in Dry Fork, moved to the area when their son Virgil was nine.  ECF No. 144 at 6:16-20.  Virgil Rickstrew, like Bob Prather, attended the Dry Fork School.  However instead of riding to the schoolhouse along the road, Virgil walked to school across a nearby rancher's fields.  *Id.* at 8:10-25.

The evidence from this early settlement period shows that patentees in the Dry Fork valleys generally occupied their patented lands and used both North and Middle Dry Fork Roads to access their property.  These patentees, their successors in interest, and other residents worked the land, herded cattle, and traveled to DeBeque for food and other supplies.  Out-of-towners also used the roads to visit family, to hunt, or to access farms or ranches where they worked seasonally.  The Court notes that no party presented evidence suggesting any of the patentees, landowners, or residents along these roads granted one another easements to cross their land.  Tr. 415:9–417:2, 591:5-10, 597:21–598:1; Ex. 111.  Nor was there evidence that any resident, landowner, traveler, or other person requested permission to travel along the roads.  The Court therefore finds that people in the Dry Fork area considered these routes public and used them freely and without constraint during this time period.

## C.  <u>Mining in the Dry Fork area in the 1910s and 1920s</u>

In addition to the above history of patentees and other settlers using North and Middle Dry Fork Roads, these routes supported mining activity in the area from the 1910s.  The Oil Shale Mining Company, one of the region's mining operations, was founded in October 1916.  Ex. 519 at 29.  To facilitate its operations the company built a cookhouse and a bunkhouse in the area by 1916.  *Id.* at 29.  The company constructed an oil shale retort in 1917 on a hillside in Middle Dry Fork Canyon about a mile up the valley from the Y.  *Id.* at 23; Tr. 453:13–454:6.

The company also built a tramway.  However, it was deemed unsafe and likely never used.  Ex. 519 at 31.  To construct these structures, the company needed to bring in laborers and haul in materials and equipment, which would have required travel westward up the roads.

Mr. Beckwith testified that the retort was built along the western side of Middle Dry Fork Road, in the same area where Mr. Becker acquired a homestead patent in 1933.  Tr. 412:25–413:6.  A map of oil shale activity placed the Oil Shale Mining Company's activity slightly north of Mr. Becker's parcel, west of the Y between Middle and North Dry Fork Roads, roughly in Sec. 27 TS 7S-R100W.  Ex. 519 at 28.  The Belvedere Oil Shale and Refining Company operated in the Dry Fork Area as well.  The mining activity map placed its operations just south of North Dry Fork Road, roughly in Secs. 28–29 TS 7S-R100W.  *Id.*

Mining claimants were required to perfect their claims.  Under the federal Mining Act of 1872 and its Colorado corollary, C.R.S. § 34-43-101, *et seq.*, discovery was one way claimants could perfect their claim.  Perfecting discovery claims required physically traveling to a mineral deposit and putting posts around it.  Tr. 468:24–470:2.  Placer claims could be perfected without initially traveling to the deposits and instead relying on prior GLO surveys.  This "aliquot" approach provided a description of the claim in half-sections, townships, and ranges.  *Id.* at 470:2-6.  For discovery and placer claims alike, however, claimants had to file a "Location Certificate" specifying where their claim was located.

Mr. Lee testified that the field notes for the 1925 and 1926 surveys did not indicate the presence of physical markers for mining claims on the ground.  This suggested to him that the claims in the Dry Fork area were claimed by the aliquot approach, not by physically traveling to and marking the land.  *Id.* at 1015:10-23.  The Court credits this testimony.  However, even if a

claimant did not go on the land to stake the claim initially, he or she was required to perform annual "assessment work" on the mineral deposits and file a corresponding affidavit of labor and employment, which would have required physical travel to the land. *Id.* at 470:6-10.

Various location certificates and affidavits of labor and employment demonstrate mining activity near the disputed portions of North and Middle Dry Fork Roads. Four placer claims referred to as "Paper Shale Mining Claims" numbers one through four were discussed at trial. Ex. 525. Their location certificates, dated 1919 and 1920, state that these claims were located across Secs. 25 and 36, TS 7S-R101W; Sec. 1, TS 8S-R101W; and Secs. 19, 20, 29, 30, TS 7S-R99W.[5] This placed them partly to the west of the western end of North Dry Fork Road, and just north of North Dry Fork Road between the current locked gate and the Y. Ex. 128 at 3.

The Paper Shale Mining Claims originally belonged to the Oil Shale Mining Company. However, in 1921 the company ceased operations. Ex. 519 at 33. Harry Flynn, the company's founder, failed to do the required assessment work, and the claims transferred to L.D. Crandell around 1926. Affidavits of labor and employment show that first Mr. Crandell and then a Mr. Murdock did assessment work yearly from 1923 through 1929 on the first three paper shale claims. Morlock also did assessment work on the fourth in 1929. Ex. 569 at 142–47.[6]

The Oil Shale Mining Company also originally owned another set of placer claims in the area, named Independent, Cinnamon Bear, Grizzly Cub, Coal Canon, Susan, Blue Grouse, and

---

[5] A summary of exact locations per the certificates is as follows: Paper Shale 1, year 1919, S36 TS 7S-R101W, and S 1 TS 8S-R101W. Ex. 525 at 4. Paper Shale 2, year 1919, S 36 and S 25 TS 7S-R101W; S 19, 20, 29, 30 of TS 7S-R99W. *Id.* at 2, 3. Paper Shale 3, year 1919, S 36 and S 25 TS 7S-R101W. *Id.* at 2. Paper Shale 4, year 1920, S 36 and S 25, TS 7S-R101W. *Id.*

[6] Exhibit 569 encompasses both the Eighth Supplement to expert James Beckwith's report and accompanying exhibits (pages 15–188). At trial the Court sustained an objection to the report supplement on hearsay grounds but admitted the exhibits. Tr. 467:23–468:19. Any reference to Ex. 569 is thus to the exhibits only.

Red Doe.  Ex. 569 at 101.  Location certificates for these claims from 1916 placed them across Secs. 27, 28, 32, and 33, TS 7S-R100W, which is on the western end of the area between North and Middle Dry Fork Roads.  *Id.* at 110–13; Ex. 128 at 3.  Various claimants—L.D. Crandell, James Nance, Harry Flynn, J.W. Richards, and John Dalyrmple—submitted records of assessment work on these claims from 1918 through 1930.  Ex. 569 at 88, 90–100.

In 1917 and 1918 Crandell also did assessment work on a claim called Dry Fork located in Sec. 31, TS 7S-R100W just to the southeast of the most western portion of North Dry Fork Road.  *Id.* at 87; Ex. 128 at 3.  He also did assessment work in 1918 on the Mountain Lion claim, located in Sec. 31 TS 7S-R99W just south of North Dry Fork Road to the east of the Y.  Exs. 569 at 89; 128 at 3.  Finally, the Belvedere company claimed assessment work in Dry Fork area for at least one year between 1920 and 1924.  Ex. 519 at 15.  To complete this assessment work, Crandell—and anyone else doing assessment work in this period—would have had to use North and Middle Dry Fork Roads because there was no connection over Middle Dry Fork Canyon.

In an attempt to cast doubt on the substantial evidence that the roads were in use, Mr. Schulte testified that Harry Flynn's mining operation was unsuccessful, and that there was very little oil shale production in this region.  However, he also admitted he had no evidence that any of the assessment records were fraudulent.  Tr. 778:23–781:10-17, 804:9-23.  The Court finds no reason to believe that any of the above-mentioned assessment work was not actually completed.  Furthermore, whether the mining operation was successful is immaterial.  It has no bearing on whether claimants and their crews actually used the roads to access claims and attempt to mine.

During this period, access to all

 of these claims would have been solely over North Dry Fork Road and Middle Dry Fork

Road, because there was no connection across Middle Dry Fork Canyon between the two roads at that time.  Tr. 602:25–603:1, 182:13-24.  Based on the lack of evidence of other access routes to these areas, the Court finds that that the Oil Shale Mining Company used these roads to bring equipment to build the retort, cookhouse, tramway, and bunkhouse and that their laborers used the roads to travel to and from the mines throughout this period.  The Court also concludes that mining claimants used North and Middle Dry Fork Roads to access their claims throughout the later 1910s and 1920s.

### D.  The 1928–1929 road petition

In August 1928 individuals in and around the Dry Fork area filed a road petition with the Garfield County Clerk under a statute that allowed landowners to petition the government to establish a public roadway.  The purpose of the petition was to have the road included in the county's maintenance programs, because prior to that either the citizens would maintain the road or no maintenance would occur at all.  Tr. 298:19–299:14, 498:8–499:8.  This petition was not legally valid and did not create a public road by statutory dedication—neither party disputes this. *Id.* at 501:14–502:2; ECF Nos. 142-1 at 17; 143-1 at 50.

The original petition asked the County to extend an existing county road from the current intersection of North and South Dry Fork Roads to the western line of Sec. 25 TS 7S-R100W (about half of a mile west of the Y).  Tr. 498:1-7; Ex. 536 at 2.  The landowners identified in the Road Petition included Harriette Tobyne, the Home Loan and Investment Company by its president, Sam McMullin, Ashley Stoner, Rose Bishop, and Flora M. Walker as administrator of the Samuel Walker Estate.  All of these landowners except for Mr. Stoner provided Grand Junction as their address, though they owned property in the area.  Ex. 536 at 27–36.  The Home

Loan and Investment Company was a bank that had foreclosed on various properties in the area. Tr. at 432:19–433:9.  The owners of land west of the Y (Riley Stoner, Lew Young, Edgar Ditman, and Mr. Johns) did not sign the Petition.  Ex. 536 at 2.

      In response to the petition the county commissioners appointed a set of "Road Viewers" to create a report.  Ex. 536 at 33; Tr. 535:23–536:9.  The June 1929 report recommended that the road stop in Sec. 28 TS 7S-R99W, a short distance west of the current locked gate, because to continue past that point would be more damaging than beneficial.  Ex. 536 at 38–40.  At a meeting in July 1929 the county commissioners initially decided to table the road petition because "the new road as set forth in the report is not a practical road for public uses."  *Id.* at 11. On September 5, 1929 the county reversed its position and declared a public road going from Sec. 6 TS 8S-R98W to the western line of Sec. 25 TS 7S-R100W, farther west along North Dry Fork Road than the Road Viewers report recommended.  The commissioners also instructed the county surveyor to survey the road, prepare a map of the road, give notice to all residents of a hearing to be conducted on September 17, 1929, and assess any applicable "damages" (condemnation payments) owed to owners of land over which the road would run.  *Id.* at 15, 23.

      The county surveyor prepared the map.  The map depicted the road, labeled "Presently Traveled Road," as ending at the northwest corner of Sec. 25 TS 7S-R100W (at the Y), though on the map the road continues as a dotted line to the west through Secs. 23, 26, and off the page. Ex. 538.  Mr. Lee testified that he did not believe the surveyor actually surveyed the area himself based on the map's language referencing the U.S. government surveys.  Tr. 992:4-11; Ex. 538. Neither party presented evidence that the surveyor conducted his own survey as required by law.

      On September 17, 1929 the commissioners held a public hearing on the road petition and

heard testimony from various landowners and other interested persons in the area.  Ex. 536 at 23.

On that day the County adopted a second resolution declaring the road in question to be a public

road.  In relevant part the resolution also declared the following:

> WHEREAS, The Board on September 5, 1929, on petition, presented to the Board and from investigation of the existing conditions on the ground, the prior use of, and necessity for the road as a public highway, on and along the road used as a public travelled roadway [identifying the road start and end points]. . . . the Clerk of this Board to give written notice to all parties interested in lands crossed by said road. Of a meeting of the Board on September 17, 1929, to hear evidence concerning the number of consecutive years the road as it exists and declared a public highway had been travelled as a public highway, and
>
> WHEREAS, . . . [the citizens appearing] . . . each stated to the Board that they were well and personally acquainted with, and had used said road for public travel, without interruption or objection on the part of owners of land crossed by said road for more than twenty consecutive years, last past, in fact for about forty consecutive years, last past; and [other citizens appearing] . . . stating from their own personal knowledge that said road was a necessary Public Highway, and should be so declared by the Board of County Commissioners; and no other persons or land owners or of those notified of this meeting appearing in reference to said road, or in opposition to the same, being declared a Public Highway, and the Board now being further sufficiently advised in reference to the prior consecutive years use of said road, and the public need thereof as a Public Highway;
>
> THEREFORE, RESOLVED, That the Board hereby ratifies and approves the resolution of the Board of September 5th, 1929, declaring said road a Public Highway and open for travel.

*Id.*[7]  In contrast to the prior resolution and the map, this second and final resolution on the road

petition identified the road as ending at the western side of Sec. 6 TS 8S-R100W, extending all

the way to the western end of Middle Dry Fork Road.  *Id.*  Mr. Lee testified that it is highly

---

[7] At trial the Ranch objected on double hearsay grounds to the admission of the statement regarding the public's use of the road for at least twenty consecutive years, and in fact forty consecutive years.  This statement was first mentioned in the September 5, 1929 resolution.  Ex. 536 at 15.  The Court admitted the statement on page 15 not for its truth, but only to provide a basis on which the Board acted.  Tr. 504:18–507:24.  The same statement was mentioned again in the September 17, 1929 resolution.  Ex. 536 at 23.  The Ranch objected again on double hearsay grounds, but on that occasion the county argued that it fell under hearsay exception "Reputation Concerning Boundaries or General History."  FED. R. EVID. 803(20) ("A reputation in a community—arising before the controversy—concerning boundaries of land in the community or customs that affect the land, or concerning general historical events important to that community, state, or nation.").  The Court admitted the evidence under this hearsay exception.  Tr. 510:9–514:14.  It thus considers page 23 for its truth as well as its impact on the Board.

likely that Sam McMullin, then-president of the Home Loan and Investment Company, influenced the commissioners' decision to pass the second resolution. [8]  Tr. 783:18–785:6.

The road petition, the resolutions, and the map prepared by the county surveyor were not recorded in the grantor-grantee index maintained by the Garfield County Clerk and Recorder. Instead, they were filed at the Clerk and Recorder office.  *Id.* at 503:18–504:17, 703:22–704:17. Despite its legal flaws, the road petition process demonstrated that community members in the Dry Fork area used North and Middle Dry Fork Roads openly and frequently as public thoroughfares.  The petition also shows that Garfield County itself believed these roads to be vital routes linking residents and different parts of the valleys to each other.

### E.  Use of the roads from 1929 until 1996

The Dry Fork Valley and use of roads changed significantly between 1929 and 1996.  For the first half of this period after the road petition, however, the public continued to freely use the roads to travel to and around the Dry Fork area.  An early map of Garfield County roads from this period, dated 1936, shows North Dry Fork Road as "bladed" until just before the Y, indicating equipment had been used to flatten it.  The map depicts North and Middle Dry Fork Roads as "primitive" going west of there, indicating they existed but had not been improved. North Dry Fork's western end terminates in Sec. 23 TS 7S-R100W, showing it considerably shorter on this map than it is today.  Ex. 540; Tr. 543:6-25.

Despite the seemingly poor condition of the road, its use persisted after the road petition process.  The federal government continued to issue various patents during this time period.

---

[8] Evidently Mr. McMullin was unliked by many in the region.  His wife was rumored to have murdered him in collaboration with another man.  A later disinterment of McMullin's body revealed poison in his stomach.  *Id.*

Unlike the early patents they were for homesteading or livestock raising, not cash entry.  Ex. 510 at 2.  Peter Becker, for example, received a homestead patent for a tract of land along much of Middle Dry Fork Road (Secs. 26, 33, 34, and 35 TS 7S-R100W).  Ex. 510 at 38–39.  His patent records show that he applied in June 1933 and proved up in 1937.  However, he did not receive his patent until April 1940 due to a delay with his naturalization certificate.  *Id.*  In 1940 Clifford Young also received a patent under the Homestead Act, at the far southwest end of Middle Dry Fork Road.  It is not clear when he first entered onto his land.  Ex. 568 at 298–299.  These records and the homesteading requirements indicate that Peter Becker and Clifford Young actively occupied their land and used North and Middle Dry Fork Roads for access.  Clifford Young owned his property until July 1940 when it passed to Lew Young, and Mr. Becker owned his until March 1941 when it also passed to Lew Young.  Exs. 568 at 47, 56; 312 at 17.

The Youngs, who were mentioned earlier, owned both of these properties along Middle Dry Fork and a parcel at the western end of North Dry Fork until 1959 when they all passed to the Beaches.  Ex. 555.  Lew Young's daughter Dixie grew up on the Young ranch.  She wrote a book about her childhood that included a picture showing her to be around six or seven in 1928, indicating she likely would have lived in Dry Fork until at least 1940 if not later.  Ex. 562 at 2.  She also included a photo of a building labeled "Mom's new house at Dry Fork," suggesting they had residences on their properties along both Middle and Dry Fork Roads.  Dixie recalled hunters coming every year and her having to go into town to get supplies.  The Youngs also had an automobile they would have driven on the roads to access their properties.  *Id.* at 4–5.

By 1929 the Home Loan and Investment Bank took over many patented parcels, but in subsequent years some tracts returned to individual hands.  For example, the parcels patented by

Price Loveless and Joseph Crandell became the site of the Goslin Ranch where the Prathers lived after the bank foreclosed on it.  Ex. 312 at 1, 5.  In 1931 J.M. Byler bought both pieces of land.  After that Loveless' parcel passed to L.W. Tilton in 1944 and then left the Tilton family in 1951, while Crandell's parcel passed to Charles Burg in 1943 and was not sold again until 1963.  *Id.*

Children from families living along the roads attended school at the Dry Fork Schoolhouse during these years.  For example, the 1932 and 1933 records of eighth grade examinations—which were required to continue onto high school—showed that examinees included Mickey and Margaret Stoner of the Ashley M. Stoner family, and Cecil and Virgil Rickstrew, sons of Chester L. Rickstrew.  Exs. 530 at 15–17; 531 at 56–57, 63–64.  Virgil Rickstrew, who was nine years old in 1925, testified in a deposition in this case that he normally did not walk along the roads to reach the school.  ECF No. 144 at 8:10-25.  However, the Court finds it more likely than not that the Stoner children did walk along North Dry Fork Road at least part of the way given the location of the Stoner properties—it would be the most direct route.  Exs. 534; 515 at 23.  U.S. census data from 1930 also shows other families with young children living in "Dry Fork," including the Johns, Walkers, Masters, Barrows, Galyeans, and Sissoms.  Ex. 531.  However, it is not clear to the Court where exactly in the Dry Fork area these residents lived.

Although he did not use the roads to get to the schoolhouse, Mr. Rickstrew did testify to using the roads during this era for other purposes.  As a teen in the mid-1930s Mr. Rickstrew traveled North Dry Fork Road to work on the upper Stoner ranch, which was slightly east of the Y intersection, and westward beyond that to Fruita, Colorado on horseback.  ECF No. 144 at 13:4–14:23; Ex. 534.  While he stated he did not need permission from any landowners to travel

the road, he did report hunters would pay for permission to hunt in the area.  According to Mr. Rickstrew there were about fifteen to twenty hunters that came through Dry Fork each season. ECF No. 144 at 15:6-10, 25:22–26:12.  He also stated he saw cattle on North Dry Fork Road, though he never saw actual cattle drives along it.  *Id.* at 17:16-19.  He himself hunted on Horse Mountain but did not use North Dry Fork Road to do so.  *Id.* at 18:10-21.

When Virgil was in his twenties (during the late 1930s and early 1940s), he and his brother Cecil operated a sawmill somewhere along North Dry Fork Road.  *Id.* at 15:11–16:19. Mr. Rickstrew's testimony about the sawmill's location seemed to place it three to four miles west of the Y.  *Id.* at 22:7-19.  This is consistent with other evidence placing it somewhere along the western end of North Dry Fork Road.  Exs. 508; 128 at 3; 547 at 1.  Cecil obtained logs from areas further west of the mill, hauled them down North Dry Fork Road to the sawmill, turned them into railroad ties, and then brought them further down the road all the way to DeBeque to be loaded on railroad cars.  ECF No. 144 at 22:15–23:1.  Though Mr. Rickstrew testified that the Stoner Ranch was "the last place on the road," the Court interprets this to mean that any route past that ranch at the time was less developed that the route east of it, since he also testified that both he and his brother went west of that location various times.  *Id.* at 11:10-20.

For three years in the early 1940s Virgil Rickstrew worked for Mr. Walker, a property owner in the Dry Fork area, and lived in his cabin, which was a bit east of the current locked gate.  *Id.* at 19:10–21:5.  Mr. Rickstrew referred to North Dry Fork Road as "the main highway road."  At that time the road ran all the way west to the Young residence, at which point it continued as a wagon dirt road that he helped build.  *Id.* at 8:18-21, 9:8–10:18.  Mr. Rickstrew said "very few" people used North Dry Fork Road while he lived in the Walker cabin.  *Id.* at

21:6-11.  Mr. Rickstrew testified that there were no gates on the road from DeBeque all the way to the Stoner place.  *Id.* at 11:8-20.  He also stated that while there was a road going up Middle Dry Fork, it had springs along it that made it unpassable most of the time.  *Id.* at 25:4-8, 27:2-4.

Some mining activity also continued in Dry Fork after the 1930s.  The Savage family took over many of the claims in the area, including the four Paper Shale Mining Claims.  Their claims were located past the western ends of North and Middle Dry Fork Roads in Secs. 30–31 TS 7S-R100W, and Secs. 25, 30, and 36 TS 7S-R101W, and Sec. 1 TS 8S-R101W (the locations were amended after GLO resurveys).  Ex. 525 at 6–9; Tr. 179:21–180:5.  To conduct their annual assessment work the Savages hauled bulldozers and other heavy equipment into North and Middle Dry Fork Canyons via North Dry Fork Road, going west past the gate and past the Y all the way to his claims.  Tr. 184:15–185:12.  In the 1950s, the Savage family and their contractor built a connector road from Middle Dry Fork Road to the south and to a road that runs through South Dry Fork in Mesa County.  In the 1960s the Savage family again used this equipment to link up the two roads in dispute here.  *Id.* at 182:16-24.  John Savage conducted assessment work on his family's mining claims in 1958 and 1959.  Ex. 569 at 150.

In 1959 the Beach family purchased the Lew Young holdings (also known as the McKay Fork properties or ranch) at the far west end of North, Middle, and Dry Fork canyons, which they owned until 1972.  Ex. 555.  The Beach family ran two cattle operations—one near Fruita in the winter, and one in McKay Fork during the summer.  Ex. 575 at 13:6-9.  They drove their cattle between Fruita and Dry Fork through the Book Cliffs, not via the roads.  *Id.* at 13:13–16:9.  Jack Beach trucked the calves in the fall by semi-truck along North and Middle Dry Fork Roads.  Mr. Beach stayed at the property every summer between 1959 and 1971, and he or his family would

drive weekly from the ranch to DeBeque for groceries.  He testified that he accessed the property via Dry Fork Road but did not specify North or South.  *Id.* at 20:6–21:9, 34:6–36:19.

The Beach family kept gates across the roads to keep cattle and horses in, but they were unlocked.  *Id.* at 22:4–23:14, 30:17–31:3, 36:2-19, 55:20–56:15.  The Lathams, nearby landowners, kept gates across the roads over their property as well, but these too were always unlocked.  *Id.*  Members of the public who traveled on the roads past these gates typically asked for permission, but Mr. Breach testified he thought it was just because they were being polite.  *Id.* at 36:20–38:20, 56:16-23.  Mr. Beach also stated he did not consider the road going up to McKay Fork—Middle Dry Fork Road—to be a county road.  *Id.* at 41:15–42:9.

In the late 1960s and 1970s land in the Dry Fork area was consolidated among fewer landowners.  This consolidation coincided with landowners along the roads beginning to lock a gate—though not always consistently—on North Dry Fork Road east of the Y.  In 1969 the Massey and Degnan families owned much of the property farther west on North Dry Fork Road.  John Doden, a High Lonesome Ranch employee in Dry Fork that year, testified that in 1969 there was a locked gate about a mile from the current locked gate.  Tr. 825:19-25, 841:18-23.  He also said that there were gates between the Degnan and Massey properties, and that the families cooperated with one another for their operations.  *Id.* at 827:13–892:3, 830:2–831:15.

In 1969, William and Clara Spears bought the Massey and Degnan holdings.  Ex. 568 at 255–300.  Linda Spears, their daughter-in-law, testified that when she lived in the area there were three gates along the roads on their property, all for cattle control.  None of these gates was locked when she first moved there in 1971.  Tr. 937:19–939:11.  The Spears only began locking a gate near the current locked gate around 1990 because local resident David Furr was

trespassing and hunting on the Spears' property. *Id.* at 927:23–928:4, 939:16–941:2.

Though the gate was not locked year-round, it was typically closed and had "No Trespassing" signs on it. *Id.* at 926:13-16. Ms. Spears testified that other individuals besides Mr. Furr went through this gate and down North Dry Fork Road, including BLM personnel, a local game warden, area landowners, and an individual who did assessment work on oil shale claims. The Cassidys, who lived on the western edge of Dry Fork on the former Beach property, occasionally drove on the road through the Spears' property. *Id.* at 922:22–925:7, 943:1–944:10. Ms. Spears indicated that at various points people asked permission to travel this portion of the road, though she does not remember who or when. *Id.* at 927:13-22.

By contrast Joe Gumber, a local wildlife officer for the Colorado Division of Wildlife, testified that there was a locked gate on the Spears property east of the Y by 1976. *Id.* at 892:4-8, 898:22-25, 905:23–907:1. He sought permission and acquired a gate key to enter the properties to the west of the gate. He also obtained a key or combination to a locked gate on the McKay Fork property. Ex. 127; Tr. 902:21–903:21, 913:13–914:16.

Either John Savage or his son Roy Savage performed assessment work on the family's mining claims every year between 1979 and 1992, typically during August. Tr. 182:25–183:7; Ex. 569 at 151, 154–66. When he encountered the locked gate along North Dry Fork Road Roy Savage would pull up the gate post, drive through, and then put the gate back in place when he and his crew had finished their work. Tr. 187:14-20. He stated that Mr. Spears, who owned the property at the time, did not contest Mr. Savage's right to go through the gate and use the road. However, Mr. Savage neither asked for nor received permission from the Spears. Roy Savage supervised employees, including a geologist and a licensed explosive expert in various years,

who presumably would also travel into the area via these roads.  *Id.* at 183:8-14, 188:8–189:13.

The Court again notes the lack of recorded easements for this entire time period.  *Id.* at 415:9–417:2, 591:5-10, 597:21–598:1; Ex. 111.  There was also no evidence that anyone sought permission from landowners or residents to use the roads between 1929 and at least 1959 when the Beaches bought most of the land—and even then the requests were likely out of politeness.

### F.  The *Enerwest* dispute

The history of these roads also includes a dispute over their public or private status that is somewhat similar to this one.  In 1981 a company named Enerwest contracted to purchase land from the Spears in Dry Fork.  The Spears had granted an easement across their property to Dyco, a different company, which essentially constituted North Dry Fork Road from a point just east of the current locked gate westward to the Y.  Ex. 110 at 1–2 (*Enerwest, Inc. v. Dyco Petroleum Corp.*, Garfield County Dist. Ct., 82-CV-93).  Enerwest sued the Spears and Dyco to prevent Dyco's exercising the easement.

At a trial before the Garfield County District Court, the parties raised whether the road in question was a public highway by prescriptive use under C.R.S. § 43-2-201.  The opinion stated that the road had been used by oil shale locators, tie hackers and sawmill operators, but that no evidence was presented as to whether such use was permissive or under claim of right.  The court found that neighbors to the west had used the road, but always permissively, and that the Spears had kept a gate at the east end of the road along with signs reading "Keep Out."  Ex. 110 at 3.  The court ultimately held that the road was not a public highway.  Ex. 280.  The Colorado Court of Appeals affirmed.  *Enerwest, Inc. v. Dyco Petroleum Corp.*, 716 P.2d 1130 (Colo. App. 1986).

### G.  High Lonesome Ranch's land acquisition and use of the roads after 1992

Around 1991 or 1992 Mr. Vahldiek first visited the Dry Fork area when he participated in an elk hunt on Horse Mountain at the invitation of an outfitter named David Furr.  He accessed the property using a four-wheeler from the South Dry Fork road area, entering through two locked gates.  At the time some of the property he went on was owned by the Lathams, from whom he asked permission to enter, while the McKay Fork Ranch was owned by a partnership of men from Florida called the "Florida Boys."  Tr. 65:11-21, 78:11–79:1.

After his visit Mr. Vahldiek set out to acquire land in the area.  *Id.* at 102:5-11.  In December 1994 his company bought a portion called the Hitchburn property, and in 1995 it bought a portion called the Broadhead property.  *Id.* at 79:14–80:5, 102:18–103:24; Ex. 113. Prior to purchasing Mr. Vahldiek physically inspected the area, which revealed North Dry Fork Road and a locked gate a mile east of the current gate.  Tr. 80:14–81:10.  He believed the road traversing the Broadhead property west of the gate was private.  *Id.* at 82:23–83:4.  Mr. Vahldiek obtained information on the Broadhead property title through a title insurance commitment.  This led him to the *Enerwest* decisions which confirmed his belief that the road on the property was private.  *Id.* at 83:15–86:23; Ex. 114.  When Mr. Vahldiek signed the contract for the Broadhead property on behalf of his company he made no objections to the land title, and he waived the right to inspect the property and rescind the contract based on inspection.  Tr. 102:18–105:6.

In 2003 Mr. Vahldiek's company acquired the McKay Fork Ranch, formerly known as the Beach Ranch and before that the Lew Young Ranch.  *Id.* at 92:6-25.  The marketing brochure for the ranch stated that there was "[a]ccess to the ranch by vehicle from DeBeque, Colorado on County Road 220 and continue on private road for 8 miles."  Ex. 115 at 3.  It also stated that "[a]ccess is controlled by private road and locked gates."  *Id.*  Based on this brochure Mr.

Vahldiek believed that the road crossing the property was private.  Tr. 93:2–94:19.

For all of the High Lonesome Ranch properties that Mr. Vahldiek purchased, he largely relied on his attorneys to investigate any property issues and did not further investigate the status of the roads across the properties.  He also relied on the *Enerwest* decisions, discussions with various affiliates of the properties, including David Furr, the McKay Fork brochure, and the presence of the locked gate for his belief that the roads across these lands were private.  *Id.* at 104:11-13, 109:15-18, 110:21–112:6, 120:9-19.  There is no lawfully recorded conveyance or dedication of a roadway across the Ranch's properties to Garfield County.  Ex. 312; Tr. 169:23–170:21.  However, the title insurance commitment and warranty deed had exceptions for rights-of-way and public roads.  Exs. 114, 567; Tr. 106:13–115:5.  December 2015 was the first time Mr. Vahldiek became aware the county was claiming the roads were public.  Tr. 96:6–98:17.

The Ranch has kept a locked gate across North Dry Fork Road continuously since at least 1996, but likely earlier.  Jim Giese, a local attorney that has hunted in Dry Fork since 1979, testified that there has been a locked gate at its current location since 1992 when he first became familiar with the High Lonesome Ranch.  *Id.* at 859:1-16, 862:5-17.  John Doden worked for the Ranch between 1996 and 2019, and he testified that there were always locked gates along the Dry Fork roads during that time.  He stated that the current locked gate was also there in 1988.  *Id.* at 825:4–851:20.  The locked gate currently bars the public from driving the roads past that point.  At some point the county asked Mr. Vahldiek to move his locked gate from a location further east to its current spot, which he did.  *Id.* at 91:17-23.

In the summer of 2020, the Pine Gulch Fire ravaged Garfield and Mesa counties.  The High Lonesome Ranch did not escape the fire unscathed.  Mr. Vahldiek's house on the property

burned down, and the fire scorched land across the entire property.  He expects around 100 million tons of sediment to flow down the valley, including across the road, as a result of the fire. *Id.* at 74:10–76:10.  At the time of trial the BLM and Colorado Parks and Wildlife had closed access to the Dry Fork area for safety reasons.  The BLM, the US Forest Services, and other federal agencies led firefighting efforts against the Pine Gulch Fire, including on the Ranch's lands.  *Id.* at 159:12-22, 340:7-15.  The county's Road and Bridge Department supported the federal government in firefighting by watering roads to reduce dust for firefighters traveling the roads and by providing motor graders and crews to cut fire lines.  This emergency work was done along North Dry Fork Road east of the locked gate and on the Ranch's property.  *Id.* at 675:10–677:16.  The county also helped with notification and evacuation.  *Id.* at 339:5–340:12.

### H.  Garfield County and BLM treatment of the roads

Garfield County's position on the roads west of the current locked gate has shifted over time, and it has often been ambiguous.  Garfield County has never maintained the parts of the roads at issue in this case.  Maintenance of county roads is at the unenforceable discretion of Garfield County.  There is no law requiring the county to maintain roads because there are many more miles of road than the county has funds to maintain.  *Id.* at 343:25 – 344:13.  At various points since the roads were created the county has maintained North Dry Fork Road up to roughly the area of the current locked gate, but not further west.  *Id.* at 696:8-16.

Virgil Rickstrew testified that Garfield County maintained the roads up Middle and North Dry Fork twice a year up to a point, in his estimation, about three or four miles "below the Stoner place."  ECF No. 144 at 27:9-22.  The Court interprets this to mean about three to four miles east of the Y, which is generally in the vicinity of the current locked gate.  Ex. 128 at 3.

Ms. Spears similarly testified that the county maintained North Fry Fork Road only up to Boldt

Gulch, just southeast of the current locked gate.  Tr. 930:10-15, 935:18–936:3.  Finally, Garfield

County Commissioner John Martin also testified that the county has historically maintained

North Dry Fork Road up to a point east of the current locked gate, where a second gate existed

for some time, but never beyond that.  *Id.* at 680:15–681:13; 696:8-15.

By contrast, since at least the 1960s landowners in the North and Middle Dry Fork area

have maintained the roads west of the locked gate without any objection or interference from the

county.  From 1969 to 1992 when they lived in the area, the Spears maintained the portion of

North Dry Fork Road running through their property.  They did not ask the county for

permission to maintain it nor did the county protest their maintenance.  *Id.* at 933:5-16, 934:21–

935:10.  Ms. Spears believed the county road ended at that gate.  Her understanding was that the

county had "abandoned" the road on their property west past Boldt Gulch years before.  *Id.* at

930:10-15, 935:18–936:3.  Mr. Vahldiek similarly testified that the Ranch improved and

maintained the roads after acquiring the surrounding property, and at times the Ranch even

maintained North Dry Fork Road east to the old Dry Fork Schoolhouse.  He also stated that the

county has never protested the Ranch's maintenance of the roads.  *Id.* at 88:3–16.

Around 1993 or 1994 Mr. Vahldiek met with the Garfield County Road and Bridge

supervisor over lunch.  He asked if he could purchase North Dry Fork Road, or have it vacated,

from the locked gate east to the schoolhouse.  Mr. Vahldiek stated that the supervisor said there

was no hope of the county vacating or selling that portion of the road.  He also testified that the

supervisor said the county considered the county road to go up to the locked gate, but not west of

it, because they received funds to maintain the road only up to that point.  *Id.* at 88:14–90:16.

Road and Bridge Director David Keesbery testified that the county maintains part of North Dry Fork Road because it has always been maintained. He stated the county only maintains that road up to a corral near a gate because that is the only place their motor graders and equipment can turn around. *Id.* at 680:15–681:9. When Mr. Martin was asked at trial why the county did not maintain past the corral, he responded that it was due to cost because the county has limited maintenance funds and the road was minimally used. In addition, maintenance past the gate is currently impossible and has been since the installation of the locked gate. Mr. Martin stated that if the gate were removed the county would maintain the road as necessary if it fell under their county road maintenance program. *Id.* at 258:14–259:8. He also said the county would do its best to collaborate with the Ranch to prevent trespassers, but it could not direct the sheriff to ensure their prosecution. *Id.* at 260:1-15, 322:13-24.

A variety of post-1950 maps of Garfield County depict the roads west of the locked gate location differently than North Dry Fork Road east of the locked gate. For example, a Garfield County map within a 1974 book listing rural residences shows County Road 200 (North Dry Fork Road) going west only until the area of the current locked gate. Ex. 145 at 6. A General Highway Map of Garfield County for 1951 shows a thin line for North and Middle Dry Fork Roads in Range 100 West. Ex. 144. A similar map for 1976 shows a thick road line going east up to a location near the current gate in Sec. 27 TS 7S-R99W and a thinner road line continuing past that point. Ex. 147. Also admitted into evidence were a 1969 map of Garfield County road numbers, an undated Garfield County Public Land Access Road and Trail Map, and a Garfield County Map from November 25, 1995 prepared by the Colorado Department of Transportation. Exs. 146, 149, 304. These maps also appear to depict the road east and west of the gate

differently.  However, the Court is unable to determine the meaning of any of these maps because they were not explained at trial, and the legends are illegible.  Tr. 948:7–949:8.

A legible map from 2012 prepared by the county's GIS department shows the roads east of the gate location in red and west of the gate location in yellow.  Ex. 158; Tr. 253:18-22. Garfield County Commissioner John Martin testified that red routes are county roads that the county maintains, while yellow routes are public rights-of-way that the county does not maintain. He stated that he believed North and Middle Dry Fork Roads west of the locked gate as depicted on the map were public roads because they were public rights-of-way.  Tr. 253:8–256:34.

Mr. Keesbery explained that there is a difference between county roads and public roads. The county receives maintenance funds for county roads through the federal Highway User Tax Fund program, but not for public roads, even though such roads are open to the public.  *Id.* at 677:17-25.  He testified that there are approximately 960 miles of county road and over 200 additional miles of public roads in Garfield County.  Mr. Keesbery also stated that there are locked gates across other county roads in Garfield County.  *Id.* at 678:1-16, 683:17–684:11.

The Court finds that these maps—even the illegible ones—show the county believed there was a difference between the roads east of the gate location versus west of it.  I credit Mr. Martin's testimony that, at least for some maps, this indicates which parts of the roads the county maintained.  Mr. Keesbery's testimony and Mr. Vahldiek's conversation with the Road and Bridge supervisor corroborate this testimony.  The maps do not unequivocally show the county believed the roads west of the gate were private routes on which the public had no right to travel.

The BLM does not have the authority to adjudicate the public or private status of roads crossing private property, at least under R.S. 2477.  *Id.* at 244:11-23, 743:16-20.  However, over

the last half-century the BLM has attempted to access these roads and addressed them in various documents given their proximity to federal land.  Since the late 1970s the BLM has referenced the locked gate (or gates) and private landowners' blocking public access along the roads.

In September 1978 the BLM issued a "North and South Dry Fork Route Analysis."  Ex. 160.  The BLM performed this analysis "to facilitate selection of access routes into the North and South Dry Fork Areas (Horse Mountain and Cow Ridge) for management purposes and to provide legal public access to approximately 90,000 acres of public land." *Id.* at 2.  North and Middle Dry Fork Roads are discussed as potential access routes, though they were described respectively as "very primitive" and "a very minimal facility." *Id.* at 6–8.  The document also stated that "[a]ccess has historically been denied to both the Bureau and the public." *Id.* at 2.

In 1980 the BLM prepared a document entitled "Spears Allotment Management Plan."  Ex. 107.  The document stated that "[p]ublic access within the allotment is very limited.  Current access is provided by county, private, or privately controlled roads.  Existing county roads provide little access to the national resource lands due to private lands being confined primarily to the narrow valley bottoms."  Ex. 107 at 11.  It proposed an easement along the "North Dry Fork drainage" as described in a Construction Project Analysis Form. *Id.*  The corresponding form from 1976 described the easement as encompassing the entire portion of North Dry Fork Road at issue in this case.  Ex. 108 at 1.  It also stated

> Public access within the North Dry Fork area is very limited.  All roads within this area cross private lands.  Landowners are very reluctant to open these roads for public use, particularly during the hunting seasons.  Numerous complaints are received each year by the Grand Junction Resource Area personnel.  Landowners lease the hunting rights to outfitters. The majority of the actual hunting is done on national resource land. Therefore, due to the blocked access problem, hunting on national resource land in this area is limited to a selected few.  BLM personnel also have a difficult time properly supervising the range program as they are often confronted with locked gates.

*Id.*  In addition, Wayne Werkmeister, Associate Field Manager for the BLM's Grand Junction office, testified that the BLM historically has asked for permission to access the roads on the High Lonesome Ranch property.  He did not specify in which year this began.  Tr. 721:5-8.

Every ten to twenty years the BLM undertakes a planning process for land and resource management under each field office.  The current plan for the Grand Junction field office, which covers the Dry Fork area, was signed in August 2015.  These Resource Management Plans include a component called a Travel Management Plan that addresses over-the-road travel on public land within the region.  *Id.* at 712:15–714:3; Exs. 167, 168.

In 2008 Garfield County was invited to formally participate in the process for the 2015 plan, but it chose not to do so.  The county did, however, provide the BLM with information and documents relevant to the process.  Tr. 248:20–249:8.  In January 2013 the BLM issued a draft plan and invited public comment on it.  Ex. 162.  In March 2013 Garfield County and the BLM entered into an MOU regarding cooperation on the plan.  Exs. 164, 169; Tr. 729:23–730:14, 248:6-11.  Mr. Martin met with the BLM multiple times about the plan and presented the BLM with various maps, including the 2012 map discussed above.  Tr. 250:8-20, 252:16–253:10.

On June 19, 2013, Garfield County provided its official comments to the proposed plan. Ex. 165; Tr. 260:21–261:19.  In its response, the county identified travel and transportation management as a key issue "because of the County's overriding belief that historic public access routes need to be kept open for access to our public lands which may sometimes cross private lands."  Ex. 165 at 1–2.  It also stated that "the maps of the routes shown . . . are incomplete as they do not acknowledge a wide variety of historic public access routes that exist across public and private lands."  *Id.*  The comments identified County Roads 205, 207, 209, 211 and 232 as

those for which the BLM had erred in its length or ownership recommendations, but not County Road 200 (North Dry Fork Road). *Id.* at 3. However, the response did recommend the BLM adopt "Alternative A," the 2012 map that depicted North and Middle Dry Fork Roads west of the gate location as public rights-of-way per Mr. Martin's testimony. *Id.* at 139.

About six months after providing comments to the BLM, the county hired Glenn Adams to investigate "historic routes" in the county. Tr. 269:2–270:12. In July 2015, Mr. Adams provided an update indicating that he believed the county "had no strong RS-2477 or Prescribed Use cases" for the roads crossing the Ranch's property. He also stated that he had found ways to access BLM land behind the ranch on foot or on horseback. Ex. 299; Tr. 276:16–279:17.

In August 2015, the BLM formally adopted its Resource Management Plan and Travel Management Plan. The corresponding BLM map depicted the roads east of the gate location as "County Road" and west of the gate as "Private," except for a few small sections labeled "Administrative and Permitted Use Only." Ex. 167. Mr. Werkmeister testified that the BLM considers the Travel Management Plan to be a "living document" subject to change. Tr. 718:3-6. The county objected to some of the findings in the final plan regarding routes and rights-of-way, but it did not appeal the Record of Decision. *Id.* at 279:23–281:12.

In December 2015 the Garfield County Board of County Commissioners held a meeting at which it heard comments about the roads. *Id.* at 287:20-23; Ex. 301. Mr. Adams, along with Mesa County resident and public lands advocate Brandon Siegfried, presented their position that the roads west of the gate were public. Scott Stewart represented the Ranch and stated that the Ranch understood the roads to be private. The Board voted to instruct the Ranch to unlock the gate and permit public access over the roads, though they recognized that the roads did not

directly cross BLM land.  Tr. 288:19–294:9, 319:12–320:4; Ex. 300.  At trial Mr. Martin testified

that this approach was a compromise meant to demonstrate the county's desire to cooperate with

the Ranch.  Tr. 312:7–314:25.  Ultimately, of course, no compromise was reached.

### III. CONCLUSIONS OF LAW

#### A.  R.S. 2477

##### 1.  Legal standard

The county's first theory is that the roads became public under Revised Statute 2477.

Congress passed R.S. 2477 as part of the Mining Act of 1866.  It is a deceptively simple and

short statute.  In its entirety it reads: "And be it further enacted, That the right-of-way for the

construction of highways over public lands, not reserved for public uses, is hereby granted."

Mining Act of July 26, 1866, § 8, 14 Stat. 253, *codified at* 43 U.S.C. § 932, *repealed by* Federal

Land Policy Management Act of 1976, Pub. L. No. 94–579 § 706(a), 90 Stat. 2793.

Until its repeal, "this statute set out an open-ended offer from the United States to the

public of a right-of-way across unreserved public lands." *Fairhurst Family Ass'n, LLC v. U.S.

Forest Serv., Dep't of Agric.*, 172 F. Supp. 2d 1328, 1330 (D. Colo. 2001).  Any R.S. 2477

rights-of-way in existence before the statute's repeal on October 21, 1976 are preserved. *Sierra

Club v. Hodel*, 848 F.2d 1068, 1078 (10th Cir. 1988), *overruled on other grounds by Vill. of Los

Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992).  The party seeking to enforce

a right-of-way carries the burden of proof.  *S. Utah Wilderness All. v. Bureau of Land Mgmt.*,

425 F.3d 735, 768 (10th Cir. 2005), *as amended on denial of reh'g* (Jan. 6, 2006) ("SUWA").

The burden for creating an R.S. 2477 right-of-way is relatively low.  "The establishment of R.S.

2477 rights of way required no administrative formalities: no entry, no application, no license, no

patent, and no deed on the federal side; no formal act of public acceptance on the part of the states or localities in whom the right was vested." *SUWA*, 425 F.3d 735, 741.

There are two requirements under R.S. 2477: (1) a right-of-way over land in the public domain, and (2) acceptance or use of it by the public. Land in the public domain "is land which is open to sale or other disposition under general laws." *Board of County Comm'rs of Cheyenne County v. Ritchey*, 888 P.2d 298, 299 (Colo. App. 1994). Land "to which any claims or rights of others have attached" is not in the public domain. *Barker v. Bd. of Cty. Comm'rs of Cty. of La Plata, Colo.*, 49 F. Supp. 2d 1203, 1215 (D. Colo. 1999). Patented land is no longer in the public domain as of the date of entry. *Id.* Land that is part of an Indian reservation is also not part of the public domain. *Ute Indian Tribe v. State of Utah*, 716 F.2d 1298, 1305 (10th Cir. 1983).

The second requirement, acceptance, is a bit more complex. Acceptance of R.S. 2477 dedications is analyzed under state law. The Tenth Circuit has stated that "federal law governs the interpretation of R.S. 2477, but that in determining what is required for acceptance of a right of way under the statute, federal law 'borrows' from long-established principles of state law, to the extent that state law provides convenient and appropriate principles for effectuating congressional intent." *SUWA*, 425 F.3d at 768; *see also Camp Bird Colorado, Inc. v. Bd. of Cty. Comm'rs of Cty. of Ouray*, 215 P.3d 1277, 1284 (Colo. App. 2009) ("Questions of whether and when the grant of a right-of-way is accepted by the public are matters of state law."). The Colorado Supreme Court has summarized states law on acceptance under R.S. 2477 as follows:

> We have had occasion to consider [R.S. 2477] . . . in varying situations. The sum of our holdings is that the statute is an express dedication of a right of way for roads over unappropriated government lands, acceptance of which by the public results from use by those for whom it was necessary or convenient. It is not required that work shall be done on such a road, or that public authorities shall take action in the premises. User is the requisite element, and it may be by any who have occasion to travel over public lands,

> and if the use be by only one, still it suffices.  A road may be a highway though it reaches but one property owner.  He has a right to access to other roads and the public has a right of access to him.  Its character is not determined by the fact that but few persons use it.

*Brown v. Jolley*, 387 P.2d 278, 281 (Colo. 1963) (quoting *Leach v. Manhart*, 77 Colo 652, 653 (Colo. 1938)).

As part of its R.S. 2477 analysis the county cites to C.R.S. § 43-2-201(e), a section of Colorado's public highway law enacted in 1883.  Currently that section states "[t]he following are declared to be public highways . . . all roads over the public domain, whether agricultural or mineral."  The Ranch correctly notes that the legislature repealed this specific section in 1893.  H.R. 119 § 1, 8th Gen. Assemb. (Colo. 1891); H.R. 231 § 1, Gen. Assemb. (Colo. 1893); H.R. 171 § 1, Gen. Assemb. (Colo. 1921).  That section was not reinstated until 1921—years after most of the land along North and Middle Dry Fork Roads was removed from the public domain.  As a result, the Ranch argues, the county cannot rely on C.R.S. § 43-2-201(e) to demonstrate acceptance for R.S. 2477 purposes.  It contends that the county must identify a different Colorado public road law, in existence before the land covering the roads was removed from the public domain, in order to show acceptance under R.S. 2477.  ECF No. 143-1 at 43.

I disagree.  The Ranch is of course correct that state law dictates what counts as "acceptance" of an R.S. 2477 right-of-way by the public.  *SUWA*, 425 F.3d at 768.  However, the Ranch's argument insists that state law must be narrowly interpreted as state *statutes*.  But Colorado authority makes clear that acceptance by the public need not necessarily be defined by statute.  *SUWA* mentions "principles" of state law, not statutes.  And judicial precedent is as much state law as a statute is.  Colorado courts have long interpreted R.S. 2477 as "an express dedication of a right of way . . . *acceptance of which by the public results from use by those for*

42

*whom it was necessary or convenient*." *Leach*, 77 P.2d at 653 (emphasis added).  Many R.S.
2477 decisions make no mention of statutes when analyzing acceptance.  They instead rely on
*Leach* and look generally for evidence of use.  *E.g. Gold Hill Dev. Co., L.P. v. TSG Ski & Golf,
LLC*, 378 P.3d 816, 823 (Colo. App. 2015); *Camp Bird*, 215 P.3d at 1289; *Lee v. Masner*, 45
P.3d 794, 795 (Colo. App. 2001); *Barker*, 49 F. Supp. 2d at 1215; *Greiner v. Bd. of Comm'rs of
Park Cty.*, 173 P. 719, 720 (Colo. 1918); *Sprague v. Stead*, 139 P. 544, 545–46 (Colo. 1914).

I conclude that to carry its R.S. 2477 burden the county must prove that land over which
the roads ran was in the public domain, and that the public accepted the rights-of-way by using
them during that time.  It need not rely on a state law also in existence at the time, such as C.R.S.
§ 43-2-201(e), to define the scope of acceptance.  Mere use is enough.  *Leach*, 77 P.2d at 653.

### 2.  Analysis: Before 1884–1885

The county first argues that there was an R.S. 2477 right-of-way through North and
Middle Dry Fork canyons based on use before 1884-1885.  I disagree.  The county bases its
contention on the 1884 and 1885 surveys depicting a "trail" running along North Dry Fork Road
to the Y and the length of Middle Dry Fork Road to the southwest.  It notes that for the trail to
appear on the surveys "someone had to use the land routes frequently enough so that the tracks
were visible . . . ."  ECF No. 142-1 at 25.

1882, the year the land was returned to the public domain, is the earliest an R.S. 2477
right-of-way could have been created because it is the earliest that no others' rights had attached
to the land.  Mr. Schulte testified he believed the trails were created by the Ute Indians, not by
later settlers.  Mr. Beckwith did not contest this—he stated that the trail was created by humans
but could not distinguish whether it was "settlers" or Native Americans who made it.  The Court

credits Mr. Schulte's testimony and concludes that these trails were created by the Ute Indians. But by 1882 the Utes had been forced out of the area, so their use of the trail was before the land became part of the public domain and thus could not have created an R.S. 2477 right-of-way.

The area's first patent entry did not occur until 1891. The county presented no evidence that any of the patentees used the route before that year, much less as early as 1884 or 1885. The only evidence that the roads were used during this period is the surveys themselves, since, as the county points out, the surveyors would have walked these routes. However, the Court finds that a surveyor walking a trail a single time in order to map its existence is not sufficient for acceptance. A government surveyor is not the "public" referred to in our R.S. 2477 cases, which refer to landowners, tenants, or other citizens not acting in an official government capacity. While use by a single property owner may be sufficient, *Leach*, 77 P.2d at 653, cases finding R.S. 2477 roads reference repeated use, not a single instance. *E.g. Camp Bird*, 215 P.3d at 1286 (describing trail "in use for mining purposes" between 1870s and 1910); *Lee*, 45 P.3d at 795 (finding public used road from 1919 until at least 1924 or 1926); *Greiner*, 173 P. at 719 (finding road was "continuously used"). I thus conclude that no R.S. 2477 right-of-way was created along North and Middle Dry Fork Roads by the time of 1884 and 1885 GLO surveys.

3.   Analysis: After 1884–1885

The county next argues that individuals who settled the Dry Fork area created an R.S. 2477 right-of-way as they patented the land. To prove existence of a road under this theory the county must show that (a) the land was not yet removed from the public domain when crossed by a right-of-way, and (b) public acceptance of the right of way through use.

The county argues for an uninterrupted R.S. 2477 right-of-way stretching to the western

44

ends of North and Middle Dry Fork Roads.  The county contends it is reasonable to assume each

patentee would have walked or ridden on their property, including along the road, prior to

making her patent entry and thus prior to the land's removal from the public domain.  According

to the county, each patentee thus created a new section of an R.S. 2477 right-of-way extending

from the Price Loveless property in 1891 at the current locked gate location, to the western end

of North Dry Fork Road with the Sarah Armstrong property in 1905, and to the western end of

Middle Dry Fork Road with the Clifford Young property in 1937–1938.  As one patentee created

an R.S. 2477 right-of-way across their property and any portion of the road to the east she

traveled to reach her land, each subsequent patentee to the east would take their land subject to

the prior-created R.S. 2477 right-of-way.  ECF No. 142-1 at 27–29; Ex. 515 at 23.

The Court disagrees with the county's narrative of R.S. 2477 route development.  There

is no evidence to support the county's assumption that any patentees traveled their land *prior* to

their patent entry date.  The first nine patents issued were cash entry and did not require physical

residence on the land at all.  The Court found that these tracts ultimately were occupied based on

tax assessor records, school records, and other historical documents, and the Court also makes

the reasonable assumption that landowners in this era would not purchase a parcel and then never

step foot on it.  But no evidence suggests the tracts were used *before* the patents issued.  While

Mr. Beckwith's suggestion that prudent landowners inspects land prior to purchase is logical, on

its own his testimony is insufficient for the Court to make such a sweeping assumption here.

I do find, however, that an R.S. 2477 route was created *between* parcels as patentees

traveled past each other's land to reach their own.  While each parcel was removed from the

public domain, any part of the road between it and the next parcel traveled by the subsequent

patentee fell under R.S. 2477.  Thus, by 1905 there was a right-of-way along North Dry Fork

Road from Fisher's to Carlisle's parcel, between Carlisle's and Crandall's parcels, and then from

Crandell's parcel all the way to Ms. Armstrong's parcel in Sec. 30 TS 7S-R100W.  Ex. 515 at 9.

Along Middle Dry Fork Road, Peter Becker and Clifford Young did not enter their

parcels and remove their land from the public domain until the 1930s.  By 1917, however, the

Oil Shale Mining Company used Middle Dry Fork Road to build and then use a bunkhouse,

cookhouse, and retort along the road without removing that land from the public domain.  The

company's own mining patents—which did remove land from the public domain—did not cross

the road but instead were in the area between North and Middle Dry Fork.  Mining activity thus

created an R.S. 2477 right-of-way that extended down Middle Dry Fork Road by 1917 as well.

The evidence shows that the public accepted this R.S. 2477 road by use.  Tax assessor

records for Ms. Armstrong indicate she used North Dry Fork Road to access her land, with her

vehicles, from at least 1907.  Subsequent patentees along North Dry Fork Road such as the

Ditmans and Ashley Stoner took their land subject to the R.S. 2477 right-of-way and used it to

reach their parcels.  Similarly, workers of the Oil Shale Mining Company would have repeatedly

used the roads to haul materials and equipment to build their structures during 1916 and 1917.

Miners doing assessment work on claims in the area would also have accessed them via the roads

through 1930.  Peter Becker and Clifford Young used the roads to reach their patented parcels

once they entered after 1933 and sometime near 1940 respectively.

I find that R.S. 2477 rights-of-way were created by 1917 along most of North and Middle

Dry Fork Roads running westward.  Because of the timeline by which land exited the public

domain, the North Dry Fork R.S. 2477 right of way had gaps.  These gaps are where the road

46

crossed the Price Loveless and Ursius Fisher parcels, in the vicinity and just west of the current locked gate location, and where it crossed the Sarah Carlisle and Joseph Crandell parcels, just east of the Y. *Id.* The county attempts to fill these gaps by relying on 43 U.S.C. § 1061, a statute prohibiting the enclosure of public lands when the enclosure was made by persons lacking right or claim to those lands. The county argues that even after a patent removed a parcel from the public domain, the patentee could not block public access along the road crossing his property because to do so would "enclose" the land still open for settlement to the west. ECF No. 142-1 at 29–30. This applied to all parcels, removing any "gap" in the R.S. 2477 right-of-way.

The county cites to *Camfield v. United States*, 167 U.S. 518 (1897) to argue that 43 U.S.C. § 1061 applies. But that case differs significantly from the situation here. *Camfield* involved a railroad completely fencing in odd-numbered land tracts in a grid that alternated with public even-numbered tracts, such that the public tracts were also entirely fenced in. *Id.* at 524, 527. In *Camfield* the public land was enclosed on all sides and virtually inaccessible without entering onto the railroad's property. Here, by contrast, the public land beyond each patentee's parcel is not enclosed at all but merely inaccessible from the east except by way of other patentees' land. A subsequent U.S. Supreme Court decision also suggests *Camfield* does not apply. *Leo Sheep Co. v. United States*, 440 U.S. 668, 685 (1979) (holding that a landowner's refusal to entertain a public road across his land does not violate 43 U.S.C. § 1061).

Furthermore, even if the *Camfield* court's holding were applicable here and required each patentee to permit travel across her land, there is no authority suggesting that each corresponding portion of road on private land would constitute an R.S. 2477 right-of-way. By definition an R.S. 2477 right-of-way can only be created when land is in the public domain. *Camfield* is thus

irrelevant to this analysis. It cannot be read to fill the gaps along North Dry Fork Road as an R.S. 2477 right-of-way. However, as I find North Dry Fork Road is public across these gaps under another theory below, the gaps are ultimately of no legal significance.

### 4. Reasonably definite line for the roads

The Ranch argues that any R.S. 2477 right-of-way is defeated by the county's failure to establish a definite route for the roads. ECF No. 143-1 at 46–48. The Ranch notes that the 1884–1885 surveys do not show North Dry Fork Road past the Y. It also notes that the roads on the 1925 resurvey did not extend to Sarah Armstrong's parcel and that the county may not rely on the later survey in any case because its placement of the roads differs from today's location.

Here too, I disagree. It is true that a public road "cannot be acquired by passing over a tract of land generally, but must be confined to a reasonably definite and certain line." *Sprague*, 139 P. at 545 (citing *Starr v. People*, 30 P. 64 (Colo. 1892); *Lieber v. People*, 81 P. 270 (Colo. 1905)). However, courts have long recognized that locations of roads shift without destroying their identity, such as "by mutual consent, evidenced by acquiescence, or it may be the result of changes resultant from natural causes." *Wilkenson v. Dep't of Interior of U.S.*, 634 F. Supp. 1265, 1275 (D. Colo. 1986). "Slight variations in the line of travel are not fatal" if it has followed "substantially the same line." *Shively v. Bd. of Cty. Comm'rs of Eagle Cty.*, 411 P.2d 782, 784 (Colo. 1966), *overruled on other grounds by McIntyre v. Bd. of Cty. Comm'rs, Gunnison Cty.*, 86 P.3d 402 (Colo. 2004) (internal quotation omitted).

Furthermore, decisions addressing the definite locations of roads have not held that changes defeat the road's existence. Instead courts have remanded for determination of the road's location. *Cent. Pac. Ry. Co. v. Alameda Cty., Cal.*, 284 U.S. 463, 466–68 (1932) (finding

a road is still identifiable despite deviations due to flooding, storms, "temporary obstructions," and development via wagons); *Sprague*, 139 P. at 545 (finding the road description too vague and remanding for a more precise description). *Lieber* is the single authority cited by the parties in which the court rejected the existence of a public road because its location was not definite. In that case the map of the relevant plat showed the road one mile west of defendant's property while the surveyor notes put it one mile east—but this two-mile deviation is much larger than any deviation noted here and suggested the existence of a second road. *Lieber*, 81 P. at 272.

Here, the 1925 resurvey shows the roads following substantially the same line as the 1884–1885 trail, with an extension further west along North Dry Fork Road as settlement expanded in that direction. I have already found that the deviations in these roads throughout their over one-hundred-year existence are minor and the obvious result of natural changes in the landscape and the changing needs of settlers along the roads as they extended. These deviations do not undermine the county's evidence showing a definite location of the roads over time.

### B. **Public prescriptive use under § 43-2-201(1)(c)**

#### 1. Legal standard

The county's second theory is that North and Middle Dry Fork Roads became a public road under C.R.S. § 43-2-201(1)(c). That part of Colorado's public highway statute states "(1) The following are declared to be public highways: . . . (c) All roads over private lands that have been used adversely without interruption or objection on the part of the owners of such lands for twenty consecutive years." The elements of public prescriptive use are: "(1) members of the public must have used the road under a claim of right and in a manner adverse to the landowner's property interest; (2) the public must have used the road without interruption for the statutory

period of twenty years; and (3) the landowner must have had actual or implied knowledge of the public's use of the road and made no objection to such use." *Bd. of Cty. Comm'rs of Saguache Cty. v. Flickinger*, 687 P.2d 975, 980 (Colo. 1984).

Adverse use "should be part of a pattern of general public use and not sporadic in nature. However, in prescriptive easement cases, intermittent use on a long-term basis satisfie[s] the requirement of adverse use." *Bockstiegel v. Bd. of Cty. Comm'rs of Lake Cty.*, 97 P.3d 324, 330 (Colo. App. 2004). Recreational use by the public for activities like fishing and hunting satisfies the adverse use requirement. *Id.* (citations omitted). There is generally a presumption that land use is adverse when the land has been used for the prescribed period of time. That presumption is not warranted when the land is vacant, unenclosed, and unoccupied. *Simon by Simon v. Pettit*, 651 P.2d 418, 420 (Colo. App. 1982), *aff'd sub nom. Simon v. Pettit*, 687 P.2d 1299 (Colo. 1984). Under § 43-2-201(1)(c) the county need not spend money on the road for it to be public by prescription. Maintaining routes or including them on a map of a street system is "a strong indication that the paths had acquired a status as public highways." *Simon*, 687 P.2d at 1303.

In 2004 the Colorado Supreme Court clarified the second element of the test. It stated

> To satisfy the claim of right requirement, the claimant must provide evidence that a reasonably diligent landowner would have had notice of the public's intent to create a public right of way. The evidence must include some overt act on the part of the public entity responsible for public roads in the jurisdiction sufficient to give notice of the public's claim of right. This notification to the landowners starts the prescriptive period; without such notice, the prescriptive period does not begin.

*McIntyre*, 86 P.3d at 406. It went on to say that including the road on the county road system and spending funds to maintain it was the "strongest indicator" of a claim of right, but plowing, installing drainage systems, using it for mail delivery or school buses, or posting signs saying it was a public road could all also constitute overt acts. *Id.* at 413–14. The Colorado Court of

Appeals interpreted *McIntyre* to require an overt act as a "prerequisite," i.e. preceding the prescriptive period in time, but not necessarily initiating it. *Gold Hill*, 378 P.3d at 826–27. The *Gold Hill* court found public prescriptive use based on an overt act when the county declared that the road was public in 1879 and included it on a 1927 US Forest Service Map. *Id.*

Having outlined the law, I now address each element in turn, though out of order.

2. Analysis

The Court finds that the county has proven the roads are public by public prescriptive use. The county's September 17, 1929 resolution accepting the road petition satisfies *McIntyre's* overt act requirement. It identified the entire length of Middle Dry Fork Road and the portion of North Dry Fork road from its fork with South Dry Fork to the Y where it intersects with Middle Dry Fork. The resolution also helps prove the third element. Prior to the final resolution the board sent out notice to interested property owners and held a public meeting at which it heard comments from citizens. The resolution itself was filed with the County Clerk and Recorder. Landowners thus knew about the road, and there is no evidence they objected to it.

Under the second element, the county has shown that the public used the roads without interruption for twenty years. The 1929 road petition itself concluded—based on testimony from landowners, tenants, and others in the area—that both roads had been used not only for the required twenty-year period, but for forty years. The evidence shows that the public continued using the roads for twenty years after the road petition too. In 1928 the Youngs acquired Ms. Armstrong's former property at the far western end of North Dry Fork road. The Youngs owned a car that they drove along that road to reach their property. Bob Prather traveled that road to work on the Young's farm. And though the Home Loan and Investment bank foreclosed on

some the parcels along North Dry Fork Road west of the current gate, other citizens like Mr.

Byler and Mr. Tilton eventually bought these properties and would have used the road to access

their properties.  A large portion of North Dry Fork Road (into Sec. 23 TS 7S-R100W) was

included on the Colorado State Highway Department's 1936 Garfield County map.  The Stoner

children used North Dry Fork Road to get to school in the 1930s.  Brothers Virgil and Cecil

Rickstrew used it to travel to Fruita, access other properties such as the Walker Ranch, and haul

railroad ties from a sawmill at the Western end down to DeBeque on the eastern end.

Middle Dry Fork Road was in use from 1916 when the Oil Shale Mining Company began

its operations.  Mining claimants did yearly assessment work on claims in 1929 and 1930, using

the road to access them.  Virgil Rickstrew recalls this road being in existence when he lived in

the area.  In 1933 Peter Becker entered his patented parcel on Middle Dry Fork and began

proving up.  He used the road to reach his land through 1940 when he received his patent and

until 1941 when he sold to Lew Young.  During the 1940s Lew Young's family used the road to

access their properties along both North and Middle Dry Fork Roads until they sold to the

Beaches in 1959.  They drove their car to and from DeBeque and hosted hunters each year.  At

no point did the Court hear evidence that a landowner blocked any part of either road between

1929 and 1949.  The Court thus concludes that the North and Middle Dry Fork roads were used

openly and freely by the public without interruption for at least twenty years.

Finally, the county has also carried its burden on the first element, adversity.  The fact

that North and Middle Dry Fork Roads were continuously traveled for more than twenty years

triggers the adverse-use presumption from *Simon*.  Even without that presumption, the evidence

before the Court proved that use of the roads was adverse.  Neither party found any record of

easements among landowners to cross one another's land.  No landowners or other interested

parties objected to the road petition at the 1917 county meeting.  The Court never heard evidence

that any landowner subsequently objected to the public's use or tried to prevent others from

traveling the roads between 1929 and 1949.  Furthermore, Mr. Rickstrew's testimony and the

memoirs about the Prather and Young families refer to these routes as a "road" instead of a path

over a particular landowner's property, as would be expected if the use were permissive.

　　　　The Ranch argues on various grounds that use of the roads was permissive, not adverse.

The Ranch first points to Bob Prather saying he had to go through gates to get to school in 1927.

ECF No. 146-1 at 21.  Setting aside that this was before 1929, Mr. Prather's opening the gates

and going through, without ever seeking permission, actually suggests *adverse* use.  In addition,

in *Flickinger* the court stated that while use of gates "to obstruct free travel along a road" would

normally render use permissive, "the placement of the gate does not conclusively establish the

character of the public use as permissive and nonadverse" because gates are sometimes erected

for other purposes, like managing livestock.  *Flickinger*, 687 P.2d at 981 (collecting cases).  *Id.*

Here, use of gates for livestock is consistent both with the prevalence of ranching in Dry Fork

and with testimony from Mr. Beach and Ms. Spears that gates were used for livestock later on.

　　　　Second, the Ranch points to landowners giving permission to others to "cross their land

for hunting and other purposes."  *Id.*  The Court presumes this is in reference to Virgil

Rickstrew's testimony.  But Mr. Rickstrew testified that hunters paid for permission to hunt on

private property, not to use the road.  The Ranch offers no other support for this statement.  Mr.

Beach's testimony was the first evidence of anyone seeking permission, and that was after 1959.

　　　　The Ranch's third argument against adversity is its statement that the only users of the

roads after 1929 were people with a property interest in the area, not the "general public."  ECF

No. 146-1 at 28; ECF No. 143-1 at 61.  The Ranch misunderstands who constitutes the public.

Landowners and residents along a road are as much a part of the public as citizens traveling in

from outside the area.  Relatedly, the Ranch asserts that land ownership in Dry Fork before 1949

came under "common, or at least related, ownership" making it likely that use of the roads was

"gladly permitted" among the owners.  ECF No. 146-1 at 21 (citing *Lovejoy v. School Dist. No.

46 of Sedgwick County*, 269 P.2d 1067, 1070 (Colo. 1954)).  The Ranch implies that when an

area is owned by a few landowners or families, this suggests that the residents grant permission

to one another to cross each other's property instead of doing so adversely.  But this argument

sounds in the doctrine of "neighborly accommodation" by which use among and between

neighbors is presumed to be permissive.  *LR Smith Inv., LLC v. Butler*, 378 P.3d 743, 749 (Colo.

App. 2014).  The doctrine is inconsistent with Colorado law, which instead says "use does not

necessarily become permissible simply because the property owner does nothing to prevent it out

of indifference, laziness, acquiescence, or neighborly accommodation."  *Id.* (quotation omitted).

    *Littlefield* is instructive on the adversity element.  The Colorado Court of Appeals held

the road in question was not public because evidence showed the road was only used

permissively.  *Littlefield v. Bamberger*, 32 P.3d 615 (Colo. App. 2001).  In that case, an oil

company moved its equipment on the road only with permission; neighbors were the only others

who used the road, also only with permission; and the landowners confronted and kicked off

anyone else who they encountered on their portion of the road.  *Id.* at 619–20.  Here the Court

has heard no evidence of permissive use of these roads before 1949, much less the extensive

evidence in *Littlefield*.  I thus conclude the county has provided sufficient evidence for adversity.

Two cases with similar facts support my overall conclusion that the roads became public through public prescriptive use.  In *Cyphers*, the Colorado Court of Appeals reviewed the trial court's finding of a public road by prescriptive use.  The road ran through private property in a canyon that was surrounded by BLM land on all sides to the north, east, and west, with the exception of one other private parcel.  *State, Dep't of Nat. Res., Wildlife Comm'n, Div. of Wildlife v. Cyphers*, 74 P.3d 447 (Colo. App. 2003).  The road had been used for years by nearby ranchers "chasing stray cattle," hunters on BLM land, and sightseers.  In 1987 a landowner installed a locked gate and effectively blocked access to thousands of acres of BLM land.  *Id.* at 449.  The Court of Appeals affirmed the trial court's holding that the road was public despite some neighbors asking permission from the landowner's predecessors to go on the property and conflicting evidence as to a locked gate between 1966 and 1972.  *Id.* at 450–51.  Here, there is even less evidence than in *Cyphers* suggesting permission and even more suggesting adversity.

In *W.H.I.*, this court considered whether a different road in Garfield County became public based on a different 1929 Board of County Commissioners resolution.  The court found the public prescriptive use period began to run no later than the 1929 resolution in which the county declared its intention to claim the road in question as a public right-of-way.  *Bd. of Cty. Commrs. for Garfield Cty., Colo. v. W.H.I., Inc.*, 992 F.2d 1061, 1066 (10th Cir. 1993).  No landowners objected to the Board's declaration.  The public used the road for logging, to access potato cellars, collect mistletoe, hunt grouse, and fish.  *Id.* at 1965.  The Tenth Circuit affirmed even though the testimony was "minimal," the record was "sparse," and the 1929 resolution was legally deficient.  It reasoned "Section 43–2–201(1)(c) does not require that public use be based on color of title or properly recorded resolutions.  The 1929 resolutions serve only to illustrate

notice of adverse, open, and notorious use by the public."  As in *W.H.I.*, here the 1929 road petition was also legally deficient but shows adverse, open, and notorious public use.  Moreover, the county here has presented far more evidence of the roads' continuous use over twenty years.

### 3.   The Ranch's remaining arguments

The Ranch makes three other arguments that I will address here.  First, it contends that the 1929 road petition was "legally invalid and falls far short of the necessary 'overt act' to establish adverse use."  ECF No. 143-1 at 50.  This assertion contradicts *McIntyre*, *Gold Hill*, and *W.H.I.*, all of which make clear that the resolution is sufficient to satisfy the requirement.

Second, citing to the *Mavromatis* case, the Ranch argues that the documents related to the road petition "are not binding on any subsequent owners of the property arguably affected thereby" because they were not filed in the county's grantor-grantee index.  ECF No. 143-1 at 52.  But *Mavromatis* is irrelevant to whether a road is public by adverse use.  In that case the city argued the road was public by statutory dedication.  The Court found for the landowner because placing the road petition in a road book was insufficient to provide constructive notice to subsequent purchasers of the land, as required by the statute.  *City of Lakewood v. Mavromatis*, 817 P.2d 90, 101 (Colo. 1991).  In *Bockstiegel* the Colorado Court of Appeals rejected the exact argument the Ranch makes here.  It concluded that because a road became public by adverse use, and not by purchase, dedication, grant, or reservation, "it is axiomatic that there would be no record notice" and that "no public notice was required either for the establishment of the road or to provide notice to subsequent purchasers."  *Bockstiegel*, 97 P.3d at 331.

Third and last, the Ranch argues that the county has offered no evidence identifying the specific location of the road.  Based on the differing road descriptions in the Road Viewer's

Report, the 1929 map, and the resolutions, it concludes that the county failed to show a "single definite, certain, and precise line." ECF No. 143-1 at 53. I disagree. The differences in the road petition documents reveal an evolution in the county's perspective on where the road should end, not uncertainty around where the road was specifically located on the ground. The September 17, 1929 resolution provided the final description of the road through specific sections. It defined the road as extending farther, all the way to the western end of Middle Dry Fork Road, presumably because it had heard additional testimony that day on the road's location and use.

This case is unlike *Barker* where the court held a road was not public by adverse use in part because of its indefinite location. There, the county argued for adverse use in part by arguing the claimed road, Lewis Creek, followed the same path as a longstanding trail, Eagle Pass Trail. The court concluded that at least part of the road was not public by adverse use because that portion diverged from the trail. *Barker*, 49 F. Supp. 2d at 1216. By contrast, here there is no question that the county was referring at all times to North and Middle Dry Fork Roads and that they had always followed substantially the same route. Nor is my conclusion defeated by Mr. Rickstrew's testimony that Middle Dry Fork was often unpassable. *Bockstiegel*, 97 P.3d at 327 (though some parts "disappeared or were washed out, overgrown, or blocked" parts of the road remained intact and continued to be used to access recreational activities).

The Court holds that the entirety of Middle Dry Fork Road, and North Dry Fork Road from the current locked gate location to the Y, became public by 1949 through adverse use under C.R.S. § 43-2-201(1)(c). The part of North Dry Fork Road created by public prescriptive use runs through all of the "gaps" in the R.S. 2477 right-of-way from Part III.A. Thus, the entirety of North and Middle Dry Fork Roads are public under these two theories combined.

### C. **Common law dedication**

The county's third theory is that the roads became public by common law dedication. Dedication is "the appropriation of an interest in land by the owner of such interest to public use." *Turnbaugh v. Chapman*, 68 P.3d 570, 572 (Colo. App. 2003) (citing *Hand v. Rhodes*, 245 P.2d 292 (Colo. 1952)). Dedication can occur by common law or by statute, and "if defective under either method, it may be operative under the other." *Fortner v. Eldorado Springs Resort Co.*, 230 P. 386, 388 (Colo. 1924).

### 1. Legal standard

Common law dedication "grants a local government an easement to use the land for purposes described in the plat." *Id.* at 573. It has two elements: (1) unequivocal intent by the property owner to dedicate the property, and (2) acceptance of the dedication by the governmental authority. *Turnbaugh*, 68 P.3d at 572; *City of Northglenn v. City of Thornton*, 569 P.2d 319, 321 (Colo. 1977). Both dedication and acceptance can be shown by a written instrument or by acts and declarations. *Mitchell v. City of Denver*, 78 P. 686, 687 (Colo. 1904). Evidence of intent to dedicate consists of "such acts or declarations by the owner as clearly and unequivocally indicate his purpose to make the dedication, or such conduct on his part as equitably estops him from denying such intention." *Starr*, 30 P. at 65. Public use of the road "for a considerable length of time, without objection by the owner of the land, may increase the weight of the evidence," but alone is insufficient for dedication. *Id.*

For acceptance "no particular form is required, as long as there is an act or acts, unequivocal in nature and showing that the municipality has assumed control and possession of the property in question." *Thornton v. City of Colorado Springs*, 478 P.2d 665, 667 (Colo. 1970)

(citations omitted).  Acceptance can be by legislative act, by governmental approval of a plat of land, or by the public entity's possession, improvement, or use of the land, e.g. as a public road. *Turnbaugh*, 68 P.3d at 572; *Bd. of Cty. Comm'rs of Delta Cty. v. Sherrill*, 757 P.2d 1085, 1088 (Colo. App. 1987).  Opening and up and improving a road constitutes sufficient acceptance of the dedication of that road.  *Thornton*, 478 P.2d at 667.  However, acceptance of the offer of dedication "must be made by the proper authorities within a reasonable time, or the right to accept may be lost."  *Bd. of Comm'rs of Jefferson Cty. v. Warneke*, 276 P. 671, 674 (Colo. 1929).

2.  Analysis

Here the county contends that there is "implied dedication arising from continuous public passage without objection by the landowner."  ECF No. 142-1 at 37.  I disagree.  While it is true that dedication can be either express or implied, *Fortner*, 230 P. at 388, the county points to no authority indicating that continuous use of the roads without objection is sufficient to evince intent by the landowners and acceptance by the county.  In fact, *Starr* holds the opposite.  *Starr*, 30 P. at 65.  Furthermore, to take the county's position would collapse dedication and public prescriptive use into one—an illogical result, as the former requires affirmative intent by landowners to allow the public to use their land, while the latter is defeated by permissive use.

As the Ranch emphasizes, there must be proof that the landowners unequivocally intended to dedicate their land.  Lack of evidence that landowners in North and Middle Dry Fork canyons objected to others traveling the roads across their properties is not enough.  Inaction is not unequivocal or unambiguous—as the Court found above, it best supports the conclusion that use of the roads was adverse, not permissive.  No party has pointed to any acts or declarations by all the landowners on North and Middle Dry Fork Roads.

The only evidence possibly suggesting intent to dedicate is thus the 1928 road petition signed by landowners Rose Bishop, A.M. Stoner, Flora A. Walker, Harriette Tobyne, and the Home Loan and Investment Company.  The 1928 petition stated "[w]e, the undersigned taxpayers and residents, who habitually use the public road of Dry Fork, respectfully petition the Honorable Board of County Commissioners of Garfield County, to extend the present County Road of Dry Fork . . . ."  Ex. 536 at 7, 28.  The Court finds that the petition's language does not signal unequivocal intent to dedicate.  The facts here are dissimilar to situations where courts found intent to dedicate based on plats or other documents that used language like "dedicate" or "for the public use" while referring to private land.  *E.g. Sherrill*, 757 P.2d at 1087–88; *State Dep't of Highways, Div. of Highways v. Town of Silverthorne*, 707 P.2d 1017, 1019 (Colo. App. 1985); *City of Greenwood Vill. v. Boyd*, 624 P.2d 362, 364 (Colo. App. 1981).  Instead, the language of the petition is best interpreted as indicating that the signers believed the road across their property to *already* be public.  They were asking the county to "extend" the county road by formally recognizing this portion of it so that the county would start maintaining it.

Though the county's resolution on the petition would likely have satisfied the second required element, acceptance, the petition itself cannot satisfy the first element.  There is no clear evidence of intent to dedicate by any landowner.  The Court therefore concludes that North and Middle Dry Fork Roads did not become public by common law dedication.

   D.  **Roads open for public travel under § 43-1-202**

      1.  Legal standard

The county's fourth and final theory is that the roads in dispute here are public under C.R.S. § 43-1-202.  That statute reads "[a]ll roads and highways which are, on May 4, 1921, by

law open to public traffic shall be public highways . . . ."  According to the county, because North and Middle Dry Fork Roads were "open to public traffic" on that date, they are public highways.  ECF No. 142-1 at 35.  However, the county fails to address an operative part of the statute's language: "by law."  The county implies that a road need only be used by the public by May 4, 1921 in order to become public.  I do not read the statute so broadly.  Instead, I find below that this statute must operate in conjunction with another statute, i.e. the roads must have been made public by some other law prior to May 4, 1921 in order for C.R.S. § 43-1-202 to apply.  In this particular case, that other law can only be R.S. 2477.

I have found little legal authority analyzing the creation of a public road under § 43-1-202, but the decisions that do exist link § 43-1-202 to another statute or statutes.  *Gold Hill* is the most instructive.  There the appellate court agreed with the trial court that plaintiff's "burden of proof for [its § 43-1-202] claim was essentially the same as for its R.S. 2477 claim."  *Gold Hill*, 378 P.3d at 827–28.  Plaintiff Gold Hill failed prove the existence of a public road prior to the 1885 when the land over which the road ran was removed from the public domain.  As a result, its R.S. 2477 claim failed, and its C.R.S. § 43-1-202 claim did as well because there was no road "by law open to public traffic" in existence prior to May 4, 1921.  *Id.*

Analyses from other cases are similar, though not as well-explained.  *Bd. of Cty. Comm'rs of Cty. of Morgan v. Kobobel*, 74 P.3d 401, 404 (Colo. App. 2002) (noting the trial court found the road public under § 43-1-202 because it had been properly dedicated to the county); *State v. Zahourek*, 935 P.2d 74, 75–76 (Colo. App. 1996) (holding trails were public under R.S. 2477 and § 43-1-202), *aff'd sub nom. Graham v. State*, 956 P.2d 556 (Colo. 1998); *Martino v. Bd. of Cty. Comm'rs of Pueblo Cty.*, 360 P.2d 804, 806–07 (Colo. 1961) (finding a

road public through a combination of R.S. 2477, § 43-1-202, and a public highway law section now codified at § 43-2-201(1)(e)).  Only in *Barker* did a court fail to analyze § 43-1-202 in conjunction with another law.  But in that case the court held that § 43-1-202 did not apply because the disputed road was not created until 1954, and thus it could not fall under the statute at all.  *Barker*, 49 F. Supp. 2d at 1216–17.  I conclude that for a road to be public under § 43-1-202 it must have been open for public traffic by operation of another law prior to or on May 4, 1921.  Both the statute's plain language and decisions interpreting it support this reading.

       2.   <u>Analysis</u>

Here, the only law that could have rendered North and Middle Dry Fork Roads public by 1921 is R.S. 2477.[9]  I conclude that these roads were also public on May 4, 1921 under § 43-1-202 to the extent that R.S. 2477 rights-of-way had been created by that date, i.e. with gaps where the road crossed the Loveless, Fisher, Carlisle, and Crandell parcels.  Because the outcome under § 43-1-1921 is the same as under R.S. 24777, this does not change the Court's holding.

**E.  <u>Abandonment</u>**

I have determined that North and Middle Dry Fork Roads are public.  I now turn to the question of whether the county has abandoned the roads.  Once a road is deemed public, "its status as a roadway continues until vacation or abandonment."  *Turnbaugh*, 68 P.3d at 573; *see also Virginia Canon Toll Rd. Co. v. People*, 45 P. 398, 400 (Colo. 1896) ("Once a highway always a highway, until vacated by the proper authorities, is the general rule.").

---

[9] There is insufficient evidence of adverse use of the roads for twenty years prior to May 4, 1921, so § 43-2-201(1)(c) cannot be the "other law."  Nor can § 43-2-201(1)(e) be the other law.  For a road to be public under that section, it must have been an agricultural or mineral road over the public domain.  As discussed in Part III.A.1, that section was repealed in 1893 and only reinstated in 1921, at which point very little of the land along North and Middle Dry Fork Roads remained in the public domain.  Finally, sections § 43-2-201(1)(a), (b), and (d) are not mentioned by the county and are all equally inapplicable.

1.  Legal standard

Abandonment of a public road is a question of fact.  *Shively*, 411 P.2d at 785.  The burden of establishing abandonment lies with the party asserting abandonment.  *Heath v. Parker*, 30 P.3d 746, 749 (Colo. App. 2000), *as modified on denial of reh'g* (Jan. 4, 2001) (citing *Korf v. Itten*, 169 P. 148 (Colo. 1917)).  Abandonment requires proof of (1) intent to abandon and (2) nonuse.  *Koenig v. Gaines*, 440 P.2d 155, 157–58 (Colo. 1968).  Analysis of intent focuses on both official and public acts, while analysis of nonuse focuses on public acts alone.  *Id.* at 157.

For intent, proof of formal county board action is not always necessary.  *Kobobel*, 74 P.3d at 407 (citing *Peroulis v. Board of County Commissioners*, 665 P.2d 134 (Colo.App.1982)).  A long period of nonuse can give rise to a presumption of abandonment, but '[t]he question of abandonment of a road involves not so much the question of time.'"  *Koenig*, 440 P.2d at 157 (quoting *Sterlane v. Fleming*, 18 N.W.2d 159, 162 (Iowa 1945)).  Nonuse is not enough unless it is paired with affirmative intent to abandon.  Occasional public use of a road for access, when there is no alternative road, will preclude a finding of abandonment.  *Cyphers*, 74 P.3d at 451.

2.  Analysis

The Court finds that the Ranch has carried its burden on the second element, nonuse.  The public has not accessed—and in fact has been unable to access—the roads since at least 1994 when the Ranch took over the property, and likely as early as the mid-1970s.  The one exception is Roy Savage and his crew, who went through the gate without permission each year during the 1980s to conduct assessment work on mining claims.  This forty-plus year period of non-use creates a presumption of abandonment.  But this presumption can be, and indeed is, overcome.

The Court finds that the Ranch fails to prove the first element of abandonment, intent.

According to the Ranch, for eighty-five years the county has taken official action inconsistent with its ownership claim over the road.  I disagree.  The Ranch argues that the county's intent to abandon the roads is shown by its failure to do the following: improve or maintain the roads; protest private improvements and maintenance; protest the locked gate before 2015; identify the roads as public on maps; intervene in or challenge the *Enerwest* decisions; or object to the BLM's designating the roads as private.  ECF No. 143-1 at  58–60.  These examples of county inaction, however, do not demonstrate intent to abandon and are not fully supported by evidence.

Non-maintenance of a road does not demonstrate intent to abandon.  *Turnbaugh*, 68 P.3d at 573 ("Improvement and maintenance by the county is not required for a road to retain its status as a public highway."); *Uhl v. McEndaffer*, 225 P.2d 839, 843 (Colo. 1950) (stating purpose of dedication is undermined if county must take physical action to avoid abandonment).  Nor does a county's failure to protest gates across a road show the requisite intent.  *Shively*, 411 P.2d at 784–85 (finding no abandonment despite county's permitting landowners to erect gates across it).  Thus, here the county's failure to maintain or to object to gates are not dispositive.

As for the *Enerwest* dispute, the county was not a party to that decision and thus cannot be bound by it.  *Pomeroy v. Waitkus*, 517 P.2d 396, 399 (Colo. 1973); *Bowen v. Turgoose*, 314 P.2d 694, 696 (Colo. 1957).  The Ranch points to no authority stating the county's failure to intervene or challenge the decision suggests intent to abandon.  Given the number of lawsuits that might implicate its interests, it is unreasonable to expect the county to proactively discover and intervene in every one.  Normally it is the duty of the litigants or the court to join an indispensable party.  *Bittle v. CAM-Colorado, LLC*, 318 P.3d 65, 69–70 (Colo. App. 2012).

The evidence does not support the Ranch's claim that the county failed to label the roads

on its maps as public.  The maps to which the Ranch presumably refers are those where North and Middle Dry Fork are depicted differently than other roads.  Mr. Martin explained, and the Court finds, that the county labels roads differently based on whether or not it receives funds for their maintenance.  The Road and Bridge Department supervisor's stating the county road ran only to the gate is consistent with Mr. Martin's account.  And, as mentioned in Part II.H, the Court is unable to determine other reasons for this difference from the maps.  Without more I will not assume the county believed the roads were private merely because the Ranch asks me to.

As further support for its abandonment argument, the Ranch contends that the county failed to object to or appeal the BLM's labeling the roads as private during the Resource Management Process.  But the Ranch's characterization of the evidence is somewhat misleading. The county did not "consent" to the BLM's determination that the roads were public.  In fact, it provided comments asking the BLM to reconsider some Travel Management Plan decisions as it failed to show many historic public access routes.  While the county did not specifically mention County Road 200 (North Dry Fork Road), this is consistent with the county *not* labeling the roads as county roads because it did not receive funds for their maintenance.  Meanwhile the county did ask the BLM to adopt an alternative plan and map depicting the roads as public rights-of-way.  Finally, even if I believed the county did consent to the BLM's determination, it still does not constitute an affirmative act, statement, or other indication of intent to abandon.

Comparison of this case to other abandonment cases helps illustrate why the Ranch does not prove abandonment.  *Koenig* is the one cited authority in which the court held that a road had been abandoned.  In that case the landowner erected a fence and a "no trespassing sign," and the road had not been used since 1935 except for "occasional, random and infrequent pedestrian

traffic." *Koenig*, 440 P.2d at 156 (Colo. 1968).  Most importantly however, the county had constructed an alternative road which had been in use for over thirty years and which was, not only the primary, but the only access route to the areas defendants wanted to access.  *Id.* at 156–57.  Here no such alternate route exists.  North and Middle Dry Fork Roads have always been, and still are, the only roads running through the Dry Fork canyons in question.

Meanwhile, courts have *not* found abandonment in situations with more evidence of intent to abandon than the Ranch has presented here.  The Colorado appellate court held in *Raftopolous* that a disputed right-of-way had not been abandoned even though part of it had never been used or improved as a road, it was not included on the official county highways users map, and one commissioner stated the county had no interest in the unused portion.  *Raftopoulos v. Farrow*, 691 P.2d 1160, 1162 (Colo. App. 1984).  With respect to the county's not including the road on the map, the court reasoned that failure to include a road on a county map was insufficient for abandonment because "normally, the county includes on its map only existing roads for which it can obtain contribution from the state's highway users fund."  *Id.*  In *Bockstiegel* the court held a road had not been abandoned despite evidence that other roads had been built to access the area; the county approved of a subdivision plat that did not mention the road; and the county stopped depicting the road on county road maps.  *Bockstiegel*, 97 P.3d at 331–32.  The court noted that the public and officials, including BLM managers, used the disputed road to access private and public land not accessible by the alternate route.  *Id.* at 332.

In the Colorado appellate decision *Martini*, the county expressly disclaimed any interest in the road and had never accepted, improved, or maintained it.  Yet the court still held there was insufficient evidence for abandonment.  *Martini*, 18 P.3d at 780.  Finally, on remand from the

Tenth Circuit this court held in *W.H.I.* that there was insufficient evidence to deem a road abandoned despite the following: the county writing "abandon" or variations on that word on three separate maps; testimony by the County Surveyor that County Commissioners took official action and instructed him to make those notations; testimony by a former County Commissioner that he understood part of the road was no longer a public road; and construction of an alternate road by the Colorado Division of Wildlife to access the same area. *United States v. W.H.I., Inc.*, 855 F. Supp. 1207, 1210 (D. Colo. 1994). Here the county never expressed a clear and explicit intent to abandon as in *W.H.I.* or *Martini*, where the courts still found the evidence insufficient.

These cases demonstrate that the burden of proof for abandonment is high. The Ranch has not met it. I conclude that the county has not abandoned North and Middle Dry Fork Roads.

### F.  Conclusion

The Court holds that the roads in dispute became public in their entirety no later than 1949 through a combination of R.S. 2477 and public prescriptive use. The county has not abandoned the roads, and they remain public today. This may seem a counterintuitive outcome for those observing that the High Lonesome Ranch and its more recent predecessors, not the county, have controlled, improved, and maintained the roads over the last few decades. But law often runs contrary to our modern expectations. In Colorado it is far easier for a road to become public than for it to cast off its public status. This reality in part reflects the historic importance of public land, and the right of everyday citizens, not just the privileged, to travel freely and to enjoy the great landscapes of this state.

**ORDER**

1.  The Court holds that North Dry Fork Road is a public road in its entirety from Sec. 27 TS

    7S-R99W through and including its western end in Sec. 31 TS 7S-R100W; and that

    Middle Dry Fork Road is a public road in its entirety from the point it begins at the Y in

    Sec. 25 TS 7S-R100W through and including its western end in Sec. 5 TS 8S-R100W.

2.  The Court orders the High Lonesome Ranch to remove all gates along North and Middle

    Dry Fork Roads, along with any padlocks, chains, or other locking devices, and to

    remove signage indicating or suggesting that the road is private or that members of the

    public may not access and use it.

3.  As the prevailing party, the Board of County Commissioners of Garfield County is

    awarded reasonable costs pursuant to FED. R. CIV. P. 54(d)(1) and D.C.COLO.LCivR

    54.1, to be taxed by the Clerk following the submission of a bill of costs.

    DATED this 22nd day of December, 2020.

                                        BY THE COURT:

                                        _____

                                        R. Brooke Jackson
                                        United States District Judge