IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 17-cv-1260-RBJ-GPG

THE HIGH LONESOME RANCH, LLC,

      Plaintiff,

v.

THE BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF GARFIELD,
THE UNITED STATES OF AMERICA, through its agency, the Bureau of Land Management, a
division of the United States Department of Interior,

      Defendants.

---

THE BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF GARFIELD,

      Counterclaim Plaintiff,

v.

THE HIGH LONESOME RANCH, LLC,
THE UNITED STATES OF AMERICA, through its agency, the Bureau of Land Management, a
division of the United States Department of Interior,

      Counterclaim Defendants.

## ORDER on REMAND

The High Lonesome Ranch and Garfield County have for years disputed whether two

roads that traverse the Ranch's property are public or private.  Following a bench trial in 2020,

this Court found that the roads are public.  *High Lonesome Ranch, LLC v. Board of County*

*Commissioners,* 508 F. Supp. 3d 801 (D. Colo. 2020) ("*High Lonesome I*").  On appeal, the

Tenth Circuit affirmed in part but reversed and remanded for reconsideration of the portion of

the order concerning Revised Statute 2477 ("R.S. 2477") and to determine the location and width

1

of the rights-of-way.  *High Lonesome Ranch, LLC v. Board of County Commissioners,* 61 F.4th 1225 (10th Cir. 2023) (*High Lonesome II*).  I address those issues in this order.

## I.   BACKGROUND.

Both this Court and the Tenth Circuit set forth the relevant history of the dispute at great length in the published orders.  I will only repeat those parts that are necessary to resolve the issues on remand.

### A.   The Roads.

The North Dry Fork Road is a dirt road east of De Beque, Colorado.  Figure 2 below shows the portion of the road commencing in Sec. 36 TS 7S-R99W on the east and proceeding westerly through mostly Ranch property (shown in white) until it forks at a Y in Sec. 25 TS 7S-R100W.  The North Dry Fork Road continues in a northwesterly direction from the Y.  The branch that proceeds southwesterly from the Y to Sec. 5 TS 8S-100W is known as the Middle Dry Fork Road.  The roads and Ranch property are surrounded and occasionally intersected by public land managed by the federal Bureau of Land Management (shown in yellow).

**Figure 2. Map of North and Middle Dry Fork Roads (Ex. 128 at 3)**



---

[1] The Township and Range coordinates are shown in Figure 1 of *High Lonesome I.*

Until this Court's order in *High Lonesome I* the Ranch maintained a locked gate across the North Dry Fork Road at the X drawn on the map in Sec. 27 TS 7S-99W, blocking public access west of the gate. Contending that the North Dry Fork and Middle Dry Fork Roads have been public roadways since the late 19th century, the County demanded that the gate be removed. The Ranch refused, and this litigation followed.

The County put forth four theories as to why the roads should be declared public: (1) they are public rights-of-way under the federal statute, R.S. 2477; (2) public prescriptive use (sometimes also referred to as adverse use) under Colo. Rev. Stat. (C.R.S.) § 43-2-201(1)(c); (3) common law dedication, and (4) roads open for public travel under C.R.S. § 43-1-202. I rejected the County's common law dedication theory, and I determined that County's fourth theory duplicated its R.S. 2477 claim. I also rejected the Ranch's abandonment defense. I concluded that "the entirety of the Middle Dry Fork Road and the North Dry Fork Road from the current locked gate location to the Y became public by 1949 through adverse use under C.R.S. §43-2-201(1)(c)." *High Lonesome I,* 508 F. Supp. at 840. Those rulings have been affirmed, and the parties now agree that the Middle Dry Fork Road and the North Dry Fork Road from the Y eastward are public roads.

As for the County's first theory, that the roads are public rights-of-way pursuant to R.S. 2477, I noted that certain "gaps" were created when individuals applied for "patents" on parcels along the roadways, and their properties were removed from the public domain. Nevertheless, I ultimately concluded that "the roads in dispute became public in their entirety no later than 1949 through a combination of R.S. 2477 and public prescriptive use." *Id.* at 846. Thus, the portion of the North Dry Fork Road west of the Y was not covered by my prescriptive use ruling but was

deemed public under R.S. 2477.  It is that portion of this Court's ruling that has been reversed and remanded for further consideration.  *High Lonesome II,* 61 F.4th at 1247-48.

To better understand the issues remaining for decision on remand, I need to explain both the R.S. 2477 and the prescriptive use issues in more detail, and I turn to that next.

**B.  R.S. 2477.**

R.S. 2477 states in its entirety: "And be it further enacted, That the right-of-way for the construction of highways over public lands, not reserved for public uses, is hereby granted." Mining Act of July 26, 1866, § 8, 14 Stat. 253, *codified at* 43 U.S.C. § 932.  The statute was repealed in 1976, but any R.S. 2477 rights-of-way in existence before the repeal were preserved. *Kane County, Utah v. United States,* 94 F.4th 1017, 1022 (10th Cir. 2024).

"To establish an R.S. 2477 right-of-way, a party must show (1) a right-of-way over the public domain, and (2) acceptance of it by use." *High Lonesome II,* 61 F.4th at 1245.  The land in question entered the public domain in 1882 when the United States took it back from the Ute Indian Reservation.  The crux of the R.S. 2477 dispute in this case was whether the public sufficiently used and accepted the North and Middle Dry Fork Roads to establish them as public-rights-of way before the roads were removed from the public domain by patent claims.

"[F]ederal law governs the interpretation of R.S. 2477, but … in determining what is required for acceptance of a right of way under the statute, federal law 'borrows' from long-established principles of state law, to the extent that state law provides convenient and appropriate principles for effectuating congressional intent." *Southern Utah Wilderness Alliance v. Bureau of Land Mgmt.* (*SUWA*), 425 F.3d 735, 768 (10th Cir. 2005), *as amended on denial of reh'g* (Jan. 6, 2006).  Borrowing from Colorado law, I cited *Brown v. Jolley,* 387 P.2d 278 (Colo.

1963), in which the Court held as follows:

> "We have had occasion to consider [R.S. 2477] in varying situations.  The sum of
> our holdings is that the statute is an express dedication of a right of way for roads
> over unappropriated government lands, acceptance of which by the public results
> from 'use by those for whom it was necessary or convenient.'  It is not required
> that 'work' shall be done on such a road, or that public authorities shall take
> action in the premises.  User is the requisite element, and it may be by any who
> have occasion to travel over public lands, and if the use be by only one, still it
> suffices.  'A road may be a highway though it reaches but one property owner.
> He has a right to access to other roads and the public has a right of access to him.
> Its character is not determined by the fact that but few persons use it.'"

*Id.* at 281 (quoting *Leach v. Manhart*, 77 P.2d 652, 653 (Colo. 1938) (*Leach's* internal citations

omitted)).

I then discussed the history of cash, homestead and other patents granted to individuals

along the North Dry Fork and Middle Dry Fork Roads after the land had entered the public

domain.  The "entry" dates for each of these patents are illustrated in **Figure 3 (Entry

Chronology for patents in the Dry Fork Area, 1891 – 1940 (Ex. 515 at 23)**:



As shown, the various patents along the North Dry Fork Road extended from a patent

granted to James Loveless depicted at the far east of the figure to a patent granted to William H.

Johns at the far west of the figure.  The disputed portion, however, begins at the gate located at the spot marked with an X on both Figures 2 and 3, which is within the space originally patented to Price Loveless in 1891 in Sec. 27 TS RS-99W.  The patents granted along the Middle Dry Fork Road extend from Harriet J. Tobyne at the Y to Clifford W. Young to the southwest.

The County argued that these roads were regularly and publicly used by the patentees. The problem with that theory was that the patent entries removed the parcels from the public domain for R.S. 2477 purposes, unless the road had become a public right-of-way under that statute before the application was submitted.  The County speculated that each of these patentees traveled both east and west of his or her prospective parcel before applying for the patent, thus collectively creating a public right-of way along the entirety of the roads before their properties left the public domain.  The evidence did not support that argument, and I determined that the patent entries created gaps in the road that largely defeated the R.S. 2477 theory east of the Y along the North Dry Fork Road.  However, those gaps ultimately did not matter, because I concluded that the North Dry Fork Road from the gate to the Y and the Middle Dry Fork Road were public under Colorado adverse-use law.  *High Lonesome I,* 508 F. Supp. 3d at 835.

### C.  Colorado Adverse-Use Law (Public Prescriptive Use).

The County contended that the North and Middle Dry Fork Roads became public roads pursuant to C.R.S. § 43-2-201(1)(c), which provides that "[a]ll roads over private lands that have been used adversely without interruption or objection on the part of the owners of such lands for twenty consecutive years" are public highways.  The elements of public prescriptive use are:

> (1) members of the public must have used the road under a claim of right and in a manner adverse to the landowner's property interest; (2) the public must have used the road without interruption for the statutory period of twenty years; and (3)

the landowner must have had actual or implied knowledge of the public's use of the road and made no objection to such use.

*Bd. of Cnty. Comm'rs of Saguache Cnty. v. Flickinger*, 687 P.2d 975, 980 (Colo. 1984).

"[I]ntermittent use on a long-term basis satisfie[s] the requirement of adverse use." *Bockstiegel v. Bd. of Cnty. Comm'rs of Lake Cnty.*, 97 P.3d 324, 330 (Colo. App. 2004). The County need not have spent money on the road for it to be public by prescription, although maintaining routes or including them on a map of a street system is "a strong indication that the paths had acquired a status as public highways." *Simon v. Pettit*, 687 P.2d at 1299, 1303 (Colo. 1984).

Importantly, the claimant must provide evidence that "a reasonably diligent landowner would have had notice of the public's intent to create a public right of way," which in turn requires that there be "some overt act on the part of the public entity responsible for public roads in the jurisdiction sufficient to give notice of the public's claim of right." *McIntyre v. Bd. of Cnty. Comm'rs, Gunnison Cnty.,* 86 P.3d 402, 406 (Colo. 2004). Including a road in the county road system and spending funds to maintain it would be an "overt act," indeed the "strongest indicator" of a claim of right; but plowing, installing drainage systems, using it for mail delivery or school buses, or posting signs saying it was a public road are other examples of what could constitute overt acts. *See id.* at 413–14. The overt act is a "prerequisite," meaning that there must be an overt act notifying the public of a claim of right for a prescriptive period to run, but the overt act need not be the point of initiation of the prescriptive period. *Gold Hill Dev. Co., L.P. v. TSG Ski & Golf, LLC,* 378 P.3d 816, 826–27 (Colo. App. 2015) (prescriptive use affirmed; the county's declaration that the road was public in 1879 and inclusion of it on a 1927 U.S. Forest Service map constituted overt acts).

In August 1928 several landowners in the Dry Fork area filed a petition asking the County to extend an existing county road from the intersection of the North and South Dry Fork Roads to the western line of Sec. 25 TS 7S-R100W, about half a mile west of the Y. Their goal was to have the road included in the county's maintenance program. On September 5, 1929, the County declared the subject road to be a public road. The County's surveyors were directed to survey the road, prepare a map, and provide notice of a public hearing. There were some issues with the survey and mapping, but nevertheless the Board held a public hearing on September 17, 1929 and adopted a resolution declaring what we refer to as the North Dry Fork Road extending from the east to the Y and the Middle Dry Fork Road to be public roads. I found that, "[d]espite its legal flaws, the road petition process demonstrated that community members in the Dry Fork area used North and Middle Dry Fork Roads openly and frequently as public thoroughfares." *High Lonesome I,* 508 F. Supp. at 820–21. I concluded that "the September 17, 1929 resolution accepting the road petition satisfie[d] *McIntyre's* overt act requirement." *Id.* at 837.

**D.  <u>The Tenth Circuit Order</u>.**

As noted above, federal courts borrow from the applicable state's law in determining what is required for acceptance of a right-of-way under R.S.2477. I relied on the Colorado Supreme Court's standard as summarized in *Brown v. Jolley,* under which acceptance results from "use by those for whom it was necessary or convenient … and if the use be by only one, still it suffices." 387 P. 2d at 281. However, Tenth Circuit held that application of *Brown*'s acceptance standard was "out of step" with its decision in *San Juan County, Utah v. United States,* 754 F.3d 787 (10th Cir. 2014)*. High Lonesome II,* 61 F.4th at 1245. Accordingly, "[t]hough we recognize that it is difficult to crystallize in a verbal formula the precise level of

8

use necessary for acceptance of an R.S. 2477 right-of-way, on remand the district court should apply to the trial evidence an acceptance standard that accords with our guidance in *San Juan County." Id.* (internal citations omitted).

## II.  THE PARTIES' POSITIONS ON REMAND.

### A.  The County's Brief.

1.  The North Dry Fork Road west of the Y.

The County argues that there is an R.S. 2477 right-of-way from the Y to the west end of the road near what was initially the William Johns property.  ECF No. 212 at 2.  The County discusses evidence of use of the road by early patentees, tax assessors, a gentleman named Virgil Rickstrew, mining claimants, sawmills, and cattle ranchers.  *Id.* at 5–9.  The County also mentions the 1928–29 road petition.  *Id.* at 9.  I will discuss much of this evidence and the conclusions I draw from it later in this order.

2.  The location and width of the roads.

The County commissioned a survey, and the parties have since agreed on the center lines of the two roads as determined by that survey (without waiving the Ranch's position than no part of the North Dry Fork Road west of the Y should be deemed public).  Accordingly, location has been determined.

The County ask the Court to determine that the roads will be 40 feet wide.  It argues that state law "define[s]the scope of an R.S. 2477 right-of-way."  *Id.* at 14 (quoting *Sierra Club v. Hodel*, 848 F.2d 1068, 1083 (10th Cir. 1988), *overruled on other grounds*, *Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992)).  And, "[t]he width of a public highway acquired by prescription must be limited in the decree to that established by the public

use." *Id.* (quoting *Goluba v. Griffith,* 830 P.2d 1090, 1091 (Colo. App. 1992)).  The County points to the 1928–29 road petition history and, in particular, the Board's declaration on September 5, 1929 that the subject road was "forty feet in width … twenty feet on each side of the center line." *Id.* (citing Ex. 536 at 15).

    **B.**  **The Ranch's Brief.**

    1.  <u>The North Dry Fork Road west of the Y</u>.

The Ranch agrees that the Court should apply state law in determining whether an R.S. 2477 right-of-way exists.  However, it argues, for the first time in this case to my knowledge, that the applicable state law is C.R.S. § 42-2-201(1)(c), the public prescriptive use statute, as interpreted in the *McIntyre* case.  ECF No. 213 at 5.  As noted above, *McIntyre* held that one requirement of public prescriptive use is "some overt act on the part of the public entity responsible for public roads in the jurisdiction sufficient to give notice of the public's claim of right."  86 P.3d 402 at 406 (2004).  The Ranch argues that the overt act must have occurred between 1882, when the land entered the public domain, and March 23, 1928, when Julia and William Ditman received a patent on their land west of the Y.  But there was no overt act during that period, and therefore, the Ranch submits, no part of the North Dry Fork Road west of the Y is public under R.S. 2477.  *Id.* at 7–8.

    2.  <u>The width of the roads</u>.

The Ranch agrees that historic usage is the key to a determination of the width of the roads.  To determine the scope of the North and Middle Dry Fork Roads, the Court must first determine "the pre-1976 uses of the right-of-way," as only rights-of-way in existence when R.S. 2477 was repealed were preserved.  *See Kane,* 94 F.4th at 1028.  Then the Court must decide

"whether, based on the pre-1976 use, the right-of-way should be widened to meet the exigencies of increased travel." *Id.*

Regarding pre-1976 uses, the Ranch argues that it "defies common sense" to suggest that in 1929 the County or the public believed that a 40-foot-wide road existed or was necessary. *Id.* at 13. The Ranch suggests that the Home Loan Bank, which acquired some of the properties along the road in foreclosure, influenced that number, thinking that a wider road would serve its interest. Instead, the Ranch points to a September 1978 BLM report which described some portions of the roads as being between eight and ten feet wide. The Ranch also notes that certain later owners of some of the properties along the road have described the road as "primitive," "not much of a road," and "not very good." *Id.* at 14. The Ranch's former manager, Scott Steward, testified that the road across the Ranch property ranged between eight and twenty feet. *Id.* The Ranch urges the Court to set the width of the North Dry Fork Road east of the Y at 30 feet and the Middle Dry Fork Road only 15 feet. *Id.* at 16.

   **C.  BLM's Brief.**

   1.  The North Dry Fork Road west of the Y.

Figure 2 shows that BLM land surrounds the Ranch's property, and that the North Dry Fork Road runs through BLM land in sections 21, 22, 29 and 30, as does the Middle Dry Fork Road in sections 4 and 5. The BLM is a party to the case, but for the most part it has not actively participated in it. Now, however, the BLM argues that the County has not shown that the historic use of the North Dry Fork Road west of the Y warrants right-of-way status under the *San Juan County* standard. ECF No. 214 at 11.

   2.  The width of the roads.

The BLM asks this Court to determine that any R.S. 2477 right-of-way across BLM land should be no more than 32 feet wide.  *Id.* at 13.

**D.  The County's Reply.**

The County criticizes the Ranch for making a new argument as to which Colorado law should be used to determine public acceptance of an R.S. 2477 right of way.  It argues that applying C.R.S. § 42-2-201(1)(c), Colorado's public prescription statute, in this context is contrary to this Court's previous analysis; contrary to the Tenth Circuit's direction on remand; and would essentially replace R.S. 2477 with the Colorado statute, even though R.S. 2477 already has an analogue at C.R.S. § 42-2-201(1)(e) ("The following are declared to be public highways . . . (e) All roads over the public domain, whether agricultural or mineral").  ECF No. 215 at 2–3.  The County also castigates the BLM for taking a position that is contrary to the position the BLM took earlier in this case.  *Id.* at 4.  On September 26, 2018, in response to the other parties' motions for summary judgment, counsel for the BLM wrote: "Having considered the arguments and evidence presented by the County and the Ranch in their respective motions, the undersigned is authorized to respond as follows: BLM does not oppose the relief requested by the County seeking a declaration that the road segments in dispute are public."  ECF No. 79 at 2.  Finally, the County states that the 40-foot width noted by the Board of County Commissioners in September 1929 is the "best evidence of the width of the Roads from the time period when the Roads were established."  *Id.* at 6.

### III.  FINDINGS AND CONCLUSIONS.

**A.  North Dry Fork Road West of the Y.**

1.  The applicable state law.

12

I reject the Ranch's new argument that the state law the Court should apply in determining whether an R.S. 2477 roadway exists is C.R.S § 43-2-201(1)(c). That statute concerns public prescriptive use, as this Court and the Tenth Circuit recognized. The Ranch's switch to advocating application of that statute to the R.S. 2477 analysis appears to me to be a stratagem to insert *McIntyre's* "overt act" requirement into the R.S. 2477 analysis. If I accepted this new approach, the result would not necessarily be one that the Ranch seeks. But I do not agree with the Ranch's argument.

I previously held that the applicable state law need not be in statute form. *High Lonesome I,* 508 F. Supp. 3d at 832. I further held that Colorado state law determining acceptance of an R.S. 2477 right-of-way is summarized in *Brown v. Jolley. Brown's* holding that "acceptance of [an R.S. 2477 right-of-way] results from use by those for whom it was necessary or convenient" is consistent with *San Juan County* as far as it goes. The problem is that *Brown* went on to say that use by even one person is sufficient to meet that standard. That is not consistent with *San Juan County.* That is why the court reversed and remanded the case "to apply to the trial evidence to an acceptance standard that accords with our guidance in *San Juan* County." *High Lonesome II,* 61 F. 4th at 1245.

2. Evidence of use of the North Dry Fork Road west of the Y.

The County cites evidence in the record, most of which was discussed in *High Lonesome I,* in support of its argument for an R.S. 2477 right-of-way on the North Dry Fork Road from the Y to the western end of the road. My reexamination of the evidence and the conclusions I draw from it follow.

Before 1905 the land west of the Y was in the public domain. In 1905 Sarah Armstrong

applied for and was granted a cash entry patent in Sec. 30 TS 7S-R100W.  *See High Lonesome I*, 508 F. Supp. 3d at 814 and Figure 3.  "Land 'to which any claims or rights of other have attached' is not in the public domain."  *Id.* at 831 (quoting *Barker v. Bd. of Cnty. Comm'rs of La Plata, Colo.*, 49 F. Supp. 2d 1203, 1215 (D. Colo. 1999)).  "Patented land is no longer in the public domain as of the date of entry."  *Id.*  Ms. Armstrong's entry date was December 30, 1905. Figure 3.[2]  Her entry took her parcel out of the public domain.

Ms. Armstrong's parcel was at the far west end of the North Dry Fork Road.  *See id.* at 815 and Figures 2 and 3.  At the time of her entry there were no other patents between Ms. Armstrong's parcel and a cash entry patent that had been issued to Joseph Crandell in 1892 on property east of the Y.  *Id.* at 834.  Therefore, for R.S. 2477 purposes, my focus will be on the stretch of the North Dry Fork Road from the Armstrong parcel to the Y.

At least beginning in 1907, Ms. Armstrong used her property extensively; and the tax assessor, who physically inspected the property, assessed her for coal and agricultural land, horses, cattle, household goods, and three road vehicles.  *Id.* at 815–16.  In 1915 she sold her property to William Ditman.  *Id.* at 815.  Ms. Armstrong probably traveled on the North Dry Fork Road from her property to the Y frequently between 1907 and 1915, and the tax assessor did so occasionally.  It is reasonable to infer that one or more other individuals assisted Ms. Armstrong with moving household goods, animals and other items to and from her property via

---

[2] The BLM states that the entry dates in Figure 3 were dates of application, not dates of entry, but that for all parcels except the Armstrong parcel, the entry and application dates were the same.  ECF No. 214 at 7.  The BLM suggests that the entry date for the Armstrong parcel was 1907.  *Id.*  To my understanding the application dates and entry dates for all the parcels are the same, including for the Armstrong parcel.  Either way, the Armstrong parcel was the first parcel along the North Dry Fork Road west of the Y to leave the public domain, and the other parcels left the public domain on the entry dates shown in Figure 3.

the North Dry Fork Road.

In 1908 William H. Johns applied for a timber and stone patent on property in Sec. 31 TS 7S-R100W, south of the Armstrong property.  *Id.* at 814 and Figures 2 and 3.  Unlike cash entry patents, timber and stone patents had requirements that created a lag between the application and the granting of a patent.  *Id.* at 814.  His patent was granted in 1915.  *Id.*  It is reasonable to infer that Mr. Johns used the North Dry Fork Road between its western end and the Y beginning around 1908, that a tax assessor probably visited his property, and that other individuals might have assisted Mr. Johns moving items to and from his property.  To the extent, if any, that the road might have extended south of the Armstrong property, her entry would have created a private property gap for R.S. 2477 purposes.[3]

On May 11, 1915, Julia and William Ditman applied for a homestead entry patent on property in Secs. 23 and 22 TS 7S-R100W, west of the Y.  *Id.* at 814 and Figures 2 and 3.  The North Dry Fork Road traverses this property.  Because the Ditmans' entry took their parcel out of the public domain, it created a gap between the Armstrong property (which Mr. Ditman purchased in the same year, 1915) and the Y.  The Ditmans probably traveled on the North Dry Fork Road from their property to the Y while they were "proving up" their homestead patent, which was issued in 1928.

On December 9, 1915, Ashley Stoner applied for a homestead entry patent on property in Secs. 25, 24 and 23 TS 7S-R100W, immediately east of the Ditmas' parcel and extending within

---

[3] It is not clear that the County is even claiming that the public right-of -way extends beyond the location of the Armstrong parcel.  In its Answer and Counterclaim the County attached a map in which it depicted the portions of the roads it is claiming as public with a heavy black line.  ECF No. 8 at 5 and 12.  The end of the black line appears to be approximately where the Armstrong parcel was located and is well short of the location of the Johns parcel.

a half mile of the Y.  *Id.*  His entry took this parcel out of the public domain and created another gap between the former Armstrong property and the Y.  Finally, on December 28, 1916, Harriette Tobyne applied for a homestead entry patent on property in section 25, bordering the Stoner parcel.  *Id.*  Her entry took the last half mile of the North Dry Fork Road out of the public domain.  It is reasonable to infer that Mr. Stoner and Ms. Tobyne traveled on the North Dry Fork Road from their properties to the Y following their entries while they were proving up their homestead patents, issued to them respectively in 1920 and 1922.

On March 4, 1919, Edgar Ditman applied for a livestock-raising patent on property primarily in Sec. 29 TS 7S-R100W.  *Id.*  It is reasonable to infer that Edgar Ditman used the portion of the North Dry Fork Road between his parcel and the Y beginning in 1919.  The portion of the road between Edgar's parcel and the Julia and William Ditman parcel was in the public domain at that time.  This piece of the road appears still to be public BLM-managed land.

The County has mentioned, as I did in *High Lonesome I,* that various mining companies operated in the area and used the North and Middle Dry Fork Roads.  Some of this mining work was located in areas where the natural access would have been by the North Dry Fork Road west of the Y.  For example, in 1917 and 1918 L.D. Crandell did assessment work on a claim in Sec. 31 TS 7S-R100W.  *Id.* at 819.  It is reasonable to infer that he used the North Dry Fork Road from approximately its western end to the Y.  From 1918 through 1930 L.D. Crandell, James Nance, Harry Flynn, J.W. Richards, and John Dalyrumple submitted records of assessment work on claims formerly belonging to the Oil Shale Mining Company in Secs. 27, 28, and 32 TS 7S-R100W.  *Id.*  It is reasonable to infer that these men used the North Dry Fork Road west of the Y to access the claims in Secs. 28 and 32, though I cannot identify which of them did so in which

years.  In addition, the Belvedere Oil Shale and Refining Company had claims in Secs. 28 and 29 TS 7S-R100W and did assessment work between 1920 and 1924.  *Id.* at 818.  Belvedere personnel would have used the North Dry Fork Road to access those claims.  But this mining-related use to the North Dry Fork Road took place after the Ditman, Stoner, and Tobyne entries removed their properties from the public domain.

The County cites the deposition testimony of Virgil Rickstrew, which was taken before Mr. Rickstrew passed away during the pendency of this case.  He and his brother used the North Dry Fork Road west of the Y to travel to Fruita, Colorado to meet up with girlfriends there.  But Virgil Rickstrew was nine years old in 1925.  *Id.* at 823.  He would not have been traveling on the road in the before 1915.  The County also notes that there were ranching operations west of the Y, but with the possible exception of Sarah Armstrong, I cannot identify ranching users during the 1907–1915 timeframe.  Finally, the County cites a 1925–26 General Land Office (predecessor to the BLM) resurvey that showed an abandoned sawmill north of the William Johns property.  It can be inferred that some persons associated with that abandoned sawmill used the North Dry Fork Road at some point before 1925, but I have not found evidence showing that it took place before 1915.

In short, much of this evidence of historic use of the North Dry Fork Road is irrelevant to the question before the Court, which is whether the County has established that there was sufficient use of the North Dry Fork Road between the Armstrong parcel and the Y to establish an R.S. 2477 right-of-way before the Ditmans' entry on May 11, 1915 removed their parcel from the public domain.  During that timeframe the evidence is that Sarah Armstong and William Johns used that portion of the road, presumably frequently.  The tax assessor and, I am assuming,

one or more individuals who might haves assisted them move items or animals in and out of their properties, used that road at least occasionally.  It is reasonable to infer that William Ditman also used that portion of the road at least occasionally during that period because he purchased the Armstrong parcel in 1915.  However, that is the only use of the road during that period that I can establish from the evidence.

Is that evidence sufficient to establish an R.S. 2477 right-of-way?  This Court was charged with applying *San Juan County's* guidance to the evidence.  In *San Juan County* the court noted that federal courts borrow from state law to determine what is required for acceptance of a right-of-way only to the extent that the state's law "'provides convenient and appropriate principles for [implementing] congressional intent.'"  *Id.* at 791 (quoting *SUWA,* 425 F.3d at 768).  The relevant law in *San Juan County* was Utah law.  A Utah statute provided that "a 'highway shall be deemed and taken as dedicated and abandoned to the use of the Public when it has been continuously and uninterruptedly used as a Public thoroughfare for a period of ten years.'"  *Id.*  The Tenth Circuit affirmed the district court's determination that the following evidence, though showing a variety of historical uses of the road, was not sufficient to show that the road had been in continuous use as a public thoroughfare for a ten-year period before it was removed from the public domain:

> (1) residential and grazing uses at a site south of the road beginning in the late 1880s or early 1890s; (2) cattle herding and grazing in Salt Creek Canyon starting around 1891 and increasing gradually through the 1950s; (3) nascent uses of the canyon by boy scouts and tourists beginning as early as 1950; and (4) some uranium mining and oil exploration in the mid- to late–1950s.

*Id.*

That part of the holding, by itself, is not dispositive here.  The Utah standard is not

applicable in this case.  Nevertheless, the collection of uses that the district court found to be

insufficient in *San Juan County,* coupled with the Tenth Circuit's discussion of other Utah case

law, is helpful in gauging the panel's thinking.  Regarding the latter, the court stated:

> Although frequency (or intensity) of use is not an explicit component of the
> "public thoroughfare" analysis, it has always been pertinent to establishing
> sufficient "passing or travel" "by the public."  *See SUWA,* 425 F.3d at 771 ("The
> decisions make clear that occasional or desultory use is not sufficient.").  For
> instance, in *Lindsay Land* [*& Livestock Co. v. Churnos,* 285 P.646 (1919)]*,* the
> Utah Supreme Court found the claimed road was used by the public generally.
> 285 P. at 648.  It reasoned the evidence showed both frequent and varied use.  *Id.*
> ("[T]he road was used by many and different persons for a variety of purposes
> [and] the use made of it was as general and extensive as the situation and
> surroundings would permit, had the road been formally laid out as a public
> highway by public authority.").  While the frequency of use need not be "great," it
> must be sufficient to call the road a "public thoroughfare."  *See Boyer v. Clark,* 7
> Utah 2d 395, 326 P.2d 107, 108-09 (1958); *see also Thompson v. Condas,* 27
> Utah 2d 129, 493 P.2d 639, 641 (1972) (intermittent or occasional use by hunters,
> fisherman, and shepherds, farmers, and miners is not sufficient); *Harding v.*
> *Bowman,* 26 Utah 2d 439, 491 P.2d 233, 234 (1971) (occasional use by deer
> hunters is insufficient); *Cassity v. Castagno,* 10 Utah 2d 16, 347 P.2d 834-
> 35(1959) (regular use by a single cattleman for driving cattle is insufficient).

754 F.3d at 798.

In short, although "it is difficult to crystallize in a verbal formula the precise level of use

necessary for acceptance of an R.S. 2477 right-of-way," the frequency, variety and intensity of

the public's use are important factors in determining whether Congressional intent is satisfied.

*See id.* at 797–99.  Here, the evidence is that only two landowners used the North Dry Fork Road

frequently between 1905 and May 11, 1915.  A tax assessor, a third landowner, and probably

some individuals who helped the landowners move things occasionally used that road during that

period.  That was enough for this Court under the *Brown v. Jolley* standard.  But I find that this

evidence lacks the frequency, and certainly the variety and intensity, of use that that the Tenth

Circuit had in mind in defining a public highway.  The County was not able to show that the

varied uses of the road by miners, sawmill operators, ranchers and romantic cowboys that potentially could have met the standard came before most of the road was removed from the public domain.  Ultimately, the patchwork created by a succession of "gaps" that doomed the finding of an R.S. 2477 right-of-way east of the Y has a similar impact on the western side of the Y.

However, I do wish to note two other pieces of evidence that potentially could have supported a conclusion that the North Dry Fork Road is public by adverse use from the Y at least to the western border of Sec. 23.  First, I noted the following in *High Lonesome I:*

> An early map of Garfield County roads from this period, dated 1936, shows North Dry Fork Road as "bladed" until just before the Y, indicating equipment had been used to flatten it.  The map depicts North and Middle Dry Fork Roads as "primitive" going west from there, indicating that they existed but had not been improved.  North Dry Fork's western end terminates in Sec. 23 TS 7S-R100W, showing it considerably shorter on this map than it is today.

*Id.* at 822 (citing Ex. 540 and Tr. 543:6–25).

This is an indication that at least a primitive portion of the North Dry Fork Road extended west through Sec. 23.  I could have cited the 1936 map as an "overt act" that would support a finding that this same part of the North Dry Fork Road is public by public prescriptive use under C.R.S. § 43-2-201(1)(c).  *See McIntyre,* 86 P.3d at 413; *Simon,* 687 P.2d at 1303.  An overt act is a prerequisite to the finding of public prescriptive use, but the overt act need not necessarily have initiated the twenty-year period.

The second piece of evidence arises from the 1928 road petition.  The petitioners hoped to include the North Dry Fork Road from the east to the western border of Sec. 25 TS 7S-R100W in the County's maintenance program.  At the Board's direction, the county surveyor prepared a map which was labeled "Presently Traveled Road."  It depicted the road ending at the northwest

corner of Sec. 25 (at the Y).  However, "on the map the road continues as a dotted line to the west through Secs. 23, 26 and off the page." *Id.* (citing Ex. 538).  Although the ultimate Board Resolution stopped at the Y and served as the "overt act" that I cited as supporting public prescription to the Y, there was recognition that road did not end there.

However, the remand order directed this Court to "reanalyze only the R.S. 2477 claim for the portion of North Dry Fork Road west of the Y." *High Lonesome II,* 61 F.4th at 1247 n.18. Therefore, an extension of the public part of the North Dry Fork Road to the west of the Y by public prescription is not an issue before me on remand.

### B.  <u>The Location and Width of the Road</u>.

As noted, the location of the centerline of the North and Middle Dry Fork Roads has been determined by survey and agreed by the parties.  The Court determines the width by examining the pre-1976 use of the right-of-way and then deciding whether the right-of-way should be widened to meet the exigencies of increased travel.  *Kane,* 94 F. 4th at 1028.  State law applies. *Id.*

The parties all cite *Goluba.*  In that case adjacent landowners disputed whether a road across the defendants' property in Eagle County was a public highway by prescriptive use pursuant to Colo. Rev. Stat. § 43-2-201(1)(c).  The road, varying between 6 and 14 feet wide, historically was used by pedestrians and horses; by ranchers for moving stock; and for commercial purposes including transportation of agricultural and lumber products.  When vehicles passed each other their wheels sometimes overhung the beaten path.  The trial court found that "ten feet on either side of the center line should accommodate the historical use of the traveled portion of the roadway and permit safe passing of vehicles going in opposite directions,"

and that "an additional six feet on either side of the traveled portion were required for support, drainage, maintenance, and repairs." 830 P.2d at 1091. The Court of Appeals affirmed, holding that "[t]he width of a public highway acquired by prescription must be limited in the decree to that established by the public use [and] is not limited to the actual beaten path but extends to such width as is reasonably necessary to accommodate the established public use." *Id.* (internal citation omitted).

The evidence in the record of this case concerning width of the roads includes the following:

- On September 5, 1929, the Board characterized the North Dry Fork Road east of the Y as "forty feet in width … twenty feet on each side of the center line." Ex. 536 at 15.

- The 1936 Garfield County road map showed the North Dry Fork Road east of the Y as "bladed" and the North Dry Fork Road west of the Y and the Middle Dry Fork Road as "primitive."

- The September 1978 BLM publication, Ex. 160, described the roads a primitive and approximately 8-10 feet wide.

- Three individuals (Jack Beach, John Doden, and Linda Spears) who were familiar with the property in the 1950s and after testified that these were minimal roads and were not very good. *See* ECF No. 213 at 14 (citing transcript references).

- Scott Steward, the former Ranch manager, testified that the roads ranged between eight and 20 feet. *Id.*

- Photographic evidence from the County's expert (Ex. 576) showed that where the gate was located the road was perhaps two car widths' wide. *Id.* He described the main road

as "worked;" the Middle Dry Fork Road as "two-tracked with some work;" and the North Dry Fork Road west of the Y in "Ditman" as "two-track." *Id.* at 14-15. The Ranch interprets its photos in Ex. 103 as consistent with this. *Id.* at 15.

The Board's reference to 40 feet is interesting, but there is no indication as to how or why the Board reached that number. I am not aware of any other evidence that either the North Dry Fork Road or the Middle Dry Fork Road was actually 40 feet wide at that time. Rather, the evidence tends to show that these roads for the most part were narrower than 40 feet in 1929, and in 1936, and still when the Ranch's manager was employed there.

But the Court considers not only the pre-1976 use of the roads but also whether the exigencies of increased travel suggest widening the roads. In that regard, the impact that gates have had, and that their removal is likely to have, must be considered. The evidence shows that locked gates were placed on the North Dry Fork Road east of the Y as early as 1969. *High Lonesome I,* 508 F. Supp. 3d at 824. According to John Doden, a longtime employee of the Ranch, there was a locked gate at the location marked by the X on Figures 2 and 3 in 1988; and there were always locked gates along the Dry Fork roads during the time he worked at the Ranch which dated back to the late 1960s. *See id.* at 826-27 and ECF No. 213 at 14. When Paul R. Vahldiek, Jr., the founder and sole proprietor of the Ranch, first visited the Dry Fork area in 1991 or 1992, he accessed the property using a four-wheeler from the South Dry Fork Road area, entering through two locked gates. *Id.* at 826.

These gates limited public use of the roads. I suggested in *High Lonesome I* that "[p]ublic access to BLM lands in the Dry Fork area would increase substantially if the public could drive up Middle and North Dry Fork Roads past the locked gate." *Id.* at 812. The Ranch's

23

continuing effort to limit public access over these roads suggests that it believes the public will take advantage of the increased access.

While the County provides no support for a 40-foot width other than the reference to the Board's statement in 1929, I find that the Ranch's proposal, particularly for a 15-foot width on the Middle Dry Fork Road, does not account for increased travel.  This potentially will include two-way traffic; increased use of trucks and trailers associated with hunting and other outdoor activities; and maintenance and repair of the roads.  Maintenance vehicles need to be able to turn around.  Consideration must also be given to shoulders, drainage ditches, and other features that are appropriate.

The BLM manages public property through which both the North Dry Fork Road and the Middle Dry Fork Road pass.  It argues that the rights-of-way across federal land should be no more than 32 feet wide.  ECF No. 214 at 2.  Interestingly, based on evidence of historical use that appears to me to be somewhat like the evidence in the present case, the *Goluba* court cited by all three parties to this case determined that the road would be 32 feet wide.  In the absence of a better alternative, the Court adopts a 32-feet width, which would support two ten-foot passing lanes and two six-foot shoulders.

I have no objection to the three parties' mutually agreeing to any alterations or adjustments, especially if they are recommended by engineers who are more suited to the task than lawyers and judges.  I leave that to their collective wisdom and judgment.

## ORDER

1. The North Dry Fork Road west of the Y is not an R.S. 2477 public right-of-way.

2. The location of the roads will be as determined by the survey commissioned by the

County.  The width of the public portions of the roads shall be 32 feet.

Dated this 25th day of September, 2024.

BY THE COURT:

_____
R. Brooke Jackson
Senior United States District Judge